# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ROBERT WARD FRAZIER,
Defendant and Appellant.

S148863

Contra Costa County Superior Court
5-041700-6

---

August 5, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion.

Justice Evans filed a dissenting opinion.

---

PEOPLE v. FRAZIER

S148863

Opinion of the Court by Guerrero, C. J.

A jury convicted Robert Ward Frazier of the murder (Pen. Code, § 187; count 1),[1] forcible rape (§ 261, subd. (a)(2); count 2), and forcible sodomy (§ 286, subd. (c)(2); count 3) of Kathleen Loreck. The jury also found true two felony-murder special-circumstance allegations: murder in the commission of rape (§ 190.2, subd. (a)(17)(C)) and murder in the commission of sodomy (§ 190.2, subd. (a)(17)(D)). At the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's automatic motion to reduce the death verdict (§ 190.4, subd. (e)) and sentenced him to death.[2] Defendant's appeal is automatic. (§ 1239, subd. (b).)

At trial, the People presented evidence that defendant killed Loreck by repeatedly hitting her in the head with an iron bar while she was on a walk. The People also presented evidence that defendant raped and sodomized Loreck. Police discovered Loreck within hours after the attack, while she was still alive. However, she died later that day. Defendant's DNA was found on both vaginal and rectal swabs taken from Loreck as well as on a bloodied iron bar found at the crime scene.

---

[1]     Unless otherwise stated, all subsequent statutory references are to the Penal Code.

[2]     The court stayed execution of the sentences on the other offenses pursuant to section 654.

1

On appeal, defendant raises claims pertaining to: (1) the trial court's excusal of a prospective juror for cause due to the prospective juror's views on the death penalty; (2) the trial court's denial of defendant's request for individually sequestered voir dire; (3) the trial court's giving of a jury instruction on a defendant's flight from the scene of a crime; (4) the trial court's denials of defendant's requests to represent himself during the penalty phase; (5) the trial court's denials of defendant's requests to represent himself during the postverdict proceedings; (6) the trial court's purported violation of defendant's Sixth Amendment right to choose the objective of his defense; and (7) the legality of the death penalty statute. We affirm the judgment in its entirety.[3]

---

[3] While this appeal was pending, and after we issued a letter advising the parties that this court could soon set the case for argument, defendant filed a motion to stay the appeal and remand the matter to the trial court to allow him to file a motion pursuant to the California Racial Justice Act of 2020 (Pen. Code, §§ 745, 1473, 1473.7; Stats. 2020, ch. 317, § 1–5) (RJA). Applying the factors described in *People v. Wilson* (Aug. 5, 2024, S118775) ___ Cal.5th ___, we conclude defendant has failed to establish good cause for staying the current appeal. For reasons explained in *Wilson*, because defendant seeks to adjudicate an RJA claim that is not intertwined with the issues on appeal, he "does not need a stay of the appeal or a remand to the superior court to raise [the RJA claim]" in a petition for writ of habeas corpus. (*Wilson*, at p. ___ [p. 104].) In addition, like the defendant in *Wilson*, defendant "is represented by the Office of the State Public Defender (OSPD)" (*id.* at p. ___ [p. 109]), and defendant "has not shown that OSPD would be unavailable to litigate his claim[] if [it was] to be raised instead through a limited-purpose habeas petition addressed exclusively to [that claim]." (*Ibid.*) Further, as in *Wilson*, we find that a stay and remand at this late stage of the appellate proceedings to pursue

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Guilt Phase Evidence

#### 1. *The prosecution's evidence*

##### a. *The attack and its immediate aftermath*

On May 13, 2003, around 1:00 p.m., Loreck left her workplace in Concord to take her regular lunchtime walk on a nearby trail. As Loreck walked, she spoke on a cell phone with her husband. Less than an hour after the call began, Loreck's husband heard a "very low sigh" that sounded to him "like breathing out." Thereafter, Loreck's husband heard a "disturbance" that made him think that Loreck "might have dropped the phone."[4] After Loreck did not respond to her husband, he grew very worried. Loreck's husband attempted to call her back but was unable to reach her. A few minutes later, Loreck's husband called his father — who also worked at Loreck's workplace — and told him what had happened.

Loreck's father-in-law unsuccessfully looked for her in the surrounding area. He then returned to their workplace and told a manager about the situation. Loreck's father-in-law and the manager decided to call the police.

Just after 3:00 p.m. that same day, a police officer received a dispatch concerning Loreck's disappearance. Within five minutes, the officer began searching for Loreck near her

---

an RJA claim would likely "cause significant delay in the resolution of his appeal." (*Wilson*, at p. ___ [p. 111].) Accordingly, we now deny defendant's motion. Our denial is without prejudice to defendant filing a petition for writ of habeas corpus raising an RJA claim as outlined in *Wilson*.

[4] The parties stipulated that the phone call ended at 1:48 p.m.

workplace. The officer observed a red stain that appeared to be blood near a portion of the paved trail where Loreck had been walking. The officer followed what appeared to be drag marks in nearby vegetation down a dirt path off the paved trail, through a cut in a fence, until he reached an area near a tree. Once there, the officer saw Loreck lying near the bottom of the path about 12 feet from the tree.

The officer observed that Loreck's clothing had been removed from her navel to her calves and that her face was completely covered in blood. Loreck's breathing was labored, and her pulse was rapid. Blood pooled beneath her head, and she bled from both ears. She had a very large gash on her scalp and many other wounds. Nearby, the officer observed a two-foot long piece of iron that appeared to have blood on it sitting next to a pool of blood.

Loreck died at the hospital at 4:45 p.m. that same day. A forensic pathologist performed an autopsy and determined that she had sustained numerous blunt force injuries to the back of her head and one injury near her right temple. In addition to skull fractures and bleeding on the brain, Loreck suffered swelling of the brain that caused her death.

b. *Evidence of defendant's commission of the offenses*

Several witnesses saw defendant near the trail around the time that the crimes occurred. Around 12:30 p.m., one of Loreck's coworkers was taking a walk and saw defendant close to Loreck's workplace near the trail on which Loreck would later walk. Defendant appeared disheveled and was acting strangely.

Around 1:00 p.m., on his way back to work, the same coworker saw Loreck on the trail. Loreck was talking on a cell phone and waved to the coworker as she walked by.

The coworker continued on the trail for five to 10 minutes and again saw defendant near the same spot where the coworker had initially seen him. Defendant was holding a jacket across his chest. A few days later, the coworker saw a bloodstain on the paved trail about five to 10 feet from where he had observed defendant holding the jacket.

A second of Loreck's coworkers went for a lunchtime run on the same trail on the day of the offenses. At the beginning of his run, the runner observed defendant sitting on the side of the trail. On his way back, the runner again noticed defendant. This time, the runner also saw Loreck, who was about 10 yards away from defendant.

A third coworker of Loreck's also took a lunchtime walk on the trail on the day of the offenses. He saw a man resembling defendant on two occasions near the location on the trail where, in the aftermath of the offenses, the coworker saw a bloodstain.

On the day of the offenses, at around 11:30 a.m., a bicyclist rode on some bike trails near Loreck's workplace. The bicyclist noticed defendant nearby. On his way back from the bike trails to the paved trail where Loreck later walked, the bicyclist saw defendant again. While the bicyclist was taking a break from his ride, defendant approached him and asked for a cigarette. The bicyclist gave defendant a cigarette and they each smoked a cigarette while chatting. After about 20 minutes, the bicyclist gave defendant another cigarette, which he saw defendant light before the bicyclist left. Police later collected three cigarette butts from the same general area as the crime scene.

A woman with whom defendant had been periodically staying saw defendant between 5:00 p.m. and 6:00 p.m. on the day of the offenses. She noticed that defendant looked very dirty. He also had multiple abrasions and a lot of dried blood on him. A day or two later, the woman's husband saw some scratch marks on defendant's face and a bruise and swelling on defendant's cheek.

A second woman with whom defendant had also been periodically staying recalled that, on the day of the murder, defendant was waiting for her when she got home from work between 5:00 p.m. and 5:30 p.m. According to the woman, defendant looked dirty, as if he had been "sleeping on the trail" — something he had commonly done before moving in with her. He asked the woman if she had heard what happened that day in Concord. After she responded that she had not, defendant explained that a woman had been killed "[o]ver on the trails." On a different day, defendant showed up at this woman's house while her best friend was there and said he had been pruning trees. He pulled up his shirt and showed the women scratches on his back, arms, and chest.

Defendant stayed at a former coworker's house one night after the offenses took place. According to the former coworker, while the two were drunk, defendant said that he was the "trailside killer," or the "Concord trail killer." At the time, the former coworker did not know about the case defendant was referring to and he did not take defendant seriously.

The forensic pathologist who performed Loreck's autopsy also performed a sexual assault exam on her. The pathologist swabbed Loreck's mouth, vagina, and rectum. Swabs were also

taken of Loreck's nipples, abdomen, pubic hair, right thigh, and left knee.

A forensic serologist examined the samples taken from the sexual assault exam. She observed a small amount of sperm on the rectal, vaginal, and thigh samples. A rectal smear created from a rectal swab contained a low number of sperm with tails. Some of the sperm on a vaginal smear also had tails. The serologist testified that the presence of tails meant that ejaculation had occurred only a few hours before the swabs were collected. A vaginal swab tested positive for a protein that cannot exist for very long in the vagina.

The serologist developed DNA profiles from the rectal, vaginal, and thigh swabs as well as from a one- to two-inch semen stain found on Loreck's sweater. The serologist also later developed DNA profiles of the cigarette butts police found near the crime scene. The serologist determined that the DNA profiles from the swabs, the sweater, and two of the cigarette butts matched defendant's DNA profile.[5]

Defendant also was included as a potential source of some of the DNA found on the bloodied iron bar discovered at the crime scene. Loreck's DNA profile also was found on swabs taken from the bar.

During an interview with police five months after the offenses, defendant acknowledged that he had been on the trail near the crime scene. However, defendant denied seeing Loreck

---

[5] The DNA profile of the third cigarette butt matched that of the bicyclist who had spoken with defendant on the day of the offenses.

walking on the day in question and denied having held a metal bar that day.

### 2. *Defense evidence*

The defense conceded that defendant's DNA was present at the scene of the offenses but contested the People's theory that the DNA established that defendant had committed rape and sodomy. Specifically, the defense presented expert testimony that due to various factors, including contamination during the collection of swabs from the victim and the possibility of drainage into the vagina, it was reasonable to infer that there had been no sexual penetration of Loreck.

### B. Penalty Phase Evidence

The People presented evidence that defendant had committed several prior crimes including a 1985 robbery, a 1986 aggravated battery, and a 1991 robbery. The People also presented evidence of an incident in 1989 during which defendant threatened a female friend with a knife and then threatened the police officer who arrested him in connection with the incident.

The People also presented victim impact evidence. Loreck's father testified that he could not "stomach" what had happened to her. Loreck's son explained that the "whole horrible ordeal that she had to go through" left a "big hole in [him]," and that it "rips into [him] every day." Her son also stated that he and his siblings had suffered from "really bad depression."

The defense presented mitigation evidence regarding defendant's dysfunctional childhood, significant mental health problems, substantial substance abuse history, prior tumultuous romantic relationships, and abnormal brain size

and functioning. The defense also presented expert testimony regarding defendant's potential mental state at the time of the offenses, including that he was likely experiencing severe psychiatric symptoms while on the trail on the day in question.

## II. DISCUSSION

### A. The Trial Court Did Not Err in Excusing a Prospective Juror Based on His Death Penalty Views

Defendant claims the trial court erred in granting the People's request to dismiss Prospective Juror No. 111 for cause due to the prospective juror's views on the death penalty. According to defendant, Prospective Juror No. 111 was qualified to serve as a capital juror because, while the prospective juror "was opposed to the death penalty," he was "willing to set aside his beliefs and follow the law." (Boldface omitted.) Defendant contends that the trial court's excusal of Prospective Juror No. 111 was based on the court's misrepresentation of the prospective juror's statements during voir dire and its misapplication of the law. He maintains that the trial court's erroneous ruling violated his right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution.[6] We reject defendant's claim.

---

[6] While defendant also summarily asserts the trial court's ruling violated his rights to a fair and reliable capital sentencing hearing and to due process, he does not present any reasoned argument in support of these contentions. Accordingly, as does defendant, we focus on the trial court's purported violation of his right to an impartial jury under the federal and state Constitutions. (See *People v. Nunez and Satele* (2013)

## 1. *Factual and procedural background*

Prior to jury selection, all prospective jurors completed a juror questionnaire. In a section entitled "General Information," one question asked, "Will you have any difficulty keeping an open mind until you have heard all the evidence and you have heard all the arguments of both counsel, and the court has given you all the instructions?" Prospective Juror No. 111 replied "No," but added, "Although I'm not confident I could recommend death in any scenario."

A second section of the questionnaire asked about the prospective juror's attitudes regarding the death penalty. In response to a question regarding the prospective juror's "general feelings regarding the death penalty" (capitalization omitted), Prospective Juror No. 111 responded, "I think it is not for human being [*sic*] to judge whether someone should be killed. I am against it, but I will obey the law and instructions from the court." When asked whether the prospective juror felt the death penalty was used too seldom or too often, Prospective Juror No. 111 wrote, "Too often. [¶] I'd rather it not be used at all." To a follow-up question that asked whether the answer to this question was based on a "religious consideration," Prospective Juror No. 111 responded in the negative.

Prospective Juror No. 111 further represented that he would not, because of his beliefs about the death penalty, refuse to: (1) find defendant guilty of first degree murder to prevent the penalty phase from taking place; (2) find true the special circumstance allegations just to prevent the penalty phase from

57 Cal.4th 1, 51 (*Nunez and Satele*) [declining to consider argument that was summarily asserted with no citation to authority].)

taking place; or (3) vote in favor of the death penalty without considering aggravating and mitigating factors.

After the prospective jurors completed the questionnaires, the trial court conducted voir dire during which the court, the prosecutor, and defense counsel questioned the prospective jurors. During the voir dire of Prospective Juror No. 111, the prosecutor stated, "[Y]ou say you're against the death penalty, but you will obey the law. How can we —"

Prospective Juror No. 111 interjected, and stated in part: "I'm trying to figure out under what situation — is it my choice to say whether or not death is appropriate or not? Because, in my opinion, I'm trying to come up with a scenario where I personally would think death would be appropriate, which would be something — I'm trying to come up with a scenario where that might be. If you think about, a bunch of children in a playground and a repeat offender, and, you know, someone that is so evil in my mind that there's just no hope of ever being able to contribute back to society in any way, shape, or form, I — then could I really think that death was appropriate? Personally? Yeah, I think maybe, you know. [¶] And what I think of as the majority of the scenarios, I just really have a hard time personally thinking that death is an appropriate penalty. [¶] Now, the question is how important is my personal opinion as to what's appropriate or not in a case like this. I don't know what all the instructions are going to be. I don't know what the — I don't know — I haven't been through it before. I don't know really where my personal opinions can amount to [*sic*]. So can I say to you, no, I will never consider voting for death? I — first of all, I don't think I can do it not having listened to any of the evidence, but I think it's very unlikely. There was a question

before that said would you be leaning one way or the other, I'd be leaning towards life."

In response, the prosecutor asked, "Is it fair to say that . . . in almost all cases you . . . could not find it appropriate to impose the death penalty?" Prospective Juror No. 111 responded, "Yes."

The prosecutor asked, "[C]ould you find it appropriate in a case where there's one murder, one rape, one sodomy, and the special circumstances that you know about in this case that are charged, is that a case where you could, under — after weighing all the evidence from the court and applying the standards, is this a situation in which you could impose the death penalty?"

After the trial court overruled an objection from the defense, the prosecutor restated the question, asking, "Could you personally in a case — could you impose it?" Prospective Juror No. 111 responded, "There's a chance, yes."

After another prospective juror interjected to ask whether there were some "parameters or thresholds . . . that would be used as a guideline," the trial court provided a summary of the penalty phase of the trial, including a description of how the jury would be asked to consider evidence pertaining to potential aggravating and mitigating factors.

Thereafter, the prosecutor asked Prospective Juror No. 111 whether his opposition to the death penalty was rooted in his religious beliefs. Prospective Juror No. 111 responded: "Yeah, I guess . . . I wouldn't associate it with religion. It's a belief. So, if you want to call it religion, I guess can you call it religion. (*Sic.*) I just don't feel like I could ever possibly having [*sic*] enough — I'm not sure how to put it." "I mean — yeah, okay, call it religion like you say. It would preferably be something that God chooses whether someone should live or die

as opposed to a human being making that choice for another human being. I don't think it is appropriate for . . . ." (*Sic.*)

Shortly thereafter, Prospective Juror No. 111 stated that he did not think he would ever have enough "wisdom" or "knowledge" to "feel qualified" to impose the death penalty. The prosecutor began to ask about the tension between Prospective Juror No. 111's statement that he "could maybe impose the death penalty," with his statement that he would not have enough "wisdom" to do so.

Prospective Juror No. 111 interjected: "So right now there's a conflict between my civic duty and what I believe. And so given a choice of how do I choose between those two things, it's kind of one of those things I'm hoping that . . . it doesn't have to come down to that. If it does come down to that, my belief is that I will follow my civic duty because it's not — in that case, I guess I justify the decision based on the fact it's really not my moral choice, it's my choice based on evidence and my civic duty to do this, and it's not like I'm personally volunteering to go and decide whether someone should live or die."

The trial court subsequently analogized the determination of whether to impose the death penalty to passing through a funnel. The court stated: "I told you that if you determined, personally, you by yourself, because everybody's going to make up their own mind on this, if you determine personally that the aggravating circumstances that you heard evidence on are so substantial in comparison with the mitigating circumstances that it warrants a sentence of death, then and under those circumstances the law allows you to vote for a sentence of death. It doesn't command it, but it allows you to. Let's call that the funnel that you have to go through to get to that. You feel the

funnel would be made narrower because of your personal reluctance to impose that?" Prospective Juror No. 111 responded, "I guess, maybe the answer to your question is yes, because when I look at this case and the sum total of the charges that are on the table, . . . I think that that is going to be . . . a very narrow funnel."

The trial court stated: "So, what I think I just heard you say, correct me if I'm wrong, is that when you get — if you were to arrive at this point, based on the evidence in this case, that under law [*sic*] you could see your way clear to the option of voting for death penalty [*sic*], your mind would then add to the equation but I'm not for this at all, and on that ground I — that's reversing everything that would otherwise do. I'm going to go the other way. I've narrowed the funnel towards the possibility of death by my personal belief." The trial court added, "I'm simply . . . asking you, sir, to put in the equation, if you wish, your personal feelings, your opposition to the death penalty, and, obviously, the overall thrust of my question is whether you feel it would interfere with your ability to consider the options at either end."

After stating he was not trying to be evasive, Prospective Juror No. 111 responded, "I guess when you say aggravating and mitigating factors, I guess my answer is the bar is going to be higher in terms of the need for substantial aggravating circumstances." The trial court responded, "Because of your —" Prospective Juror No. 111 interjected, "Well, yes." And, the trial court added, "I understand that analogy."

Defense counsel then questioned Prospective Juror No. 111 regarding the conflict between his moral judgment and his civic duty, observing, for example, that, "[I]t sounds to me

like civic duty is very important to you, because in the end that trumps over what you would do necessarily." Prospective Juror No. 111 replied, "Fair."

Defense counsel also asked, "So the [c]ourt talked about this narrowing funnel, so to speak, of the charges that you know about, but if there were additional aggravators, then that might sort of reopen the funnel to some degree; is that fair?" Prospective Juror No. 111 responded, "That's fair." Defense counsel asked, "And it sounds to me like . . . though it would be difficult, you can impose the death penalty in this case potentially?" Prospective Juror No. 111 answered, "That's — that's right. I said that and that's what I believe. It's not that I can look at you and say I've done it before. If I've done it before, I can say with certainty yes, that's how I feel now."

The prosecutor challenged Prospective Juror No. 111 for cause on the ground that his questionnaire and voir dire responses demonstrated that his personal beliefs would substantially impair his ability to serve as a capital juror. Over defense counsel's objection, the trial court granted the prosecutor's challenge and dismissed Prospective Juror No. 111. After discussing a few of the prospective juror's questionnaire responses and the court's notes concerning several of the prospective juror's voir dire responses, the trial court ultimately concluded that Prospective Juror No. 111's "personal beliefs . . . would result in him being unable to follow the law and impair his ability to accept the responsibilities for this case."

2. *Governing law and standard of review*

" 'Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.)' "

15

(*People v. Mataele* (2022) 13 Cal.5th 372, 394 (*Mataele*).) In determining whether a defendant's right to an impartial jury under the federal Constitution has been violated by the improper exclusion of a prospective juror due to his or her views on capital punishment, we apply *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*) and " 'consider whether the record fairly supports the trial court's determination that [a prospective juror's] views on the death penalty would have prevented or substantially impaired her performance as a juror.' " (*People v. Miles* (2020) 9 Cal.5th 513, 562 (*Miles*), quoting *People v. Thomas* (2011) 52 Cal.4th 336, 357.) "We 'have long adopted the *Witt* rule as also stating the standard under the California Constitution.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1191 (*Tran*).)

"A panelist's bias in favor of or against the death penalty need not be proven with ' " 'unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a [panelist] would be unable to faithfully and impartially apply the law in the case before the juror.' " ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1083 (*Ramirez*).)

We review a trial court's ruling on a request to dismiss a prospective juror for cause for substantial evidence. (See, e.g., *People v. Flores* (2020) 9 Cal.5th 371, 386.) " ' " 'Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for "appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." ' " ' " (*Miles*, *supra*, 9 Cal.5th at p. 562.) Deference is also accorded to a trial court's rulings in the death

penalty qualification context "[b]ecause prospective jurors 'may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 462.) " ' "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." ' " (*Miles*, at p. 562.)

### 3. *Analysis*

Defendant contends that the trial court erred in excusing Prospective Juror No. 111 for cause because the record demonstrates that, although Prospective Juror No. 111 was opposed to the death penalty, he was willing to set aside his beliefs and apply the law in serving as a capital juror. Defendant's argument is unavailing.

To begin, one of Prospective Juror No. 111's questionnaire responses reflected doubt about his ability to vote for the death penalty. In response to a question regarding whether he would have any difficulty keeping an open mind until hearing all the evidence, counsels' arguments, and court instructions, Prospective Juror No. 111 responded in the negative, but added, "I'm not confident I could recommend death in any scenario." The trial court referenced this written response when it excused Prospective Juror No. 111 for cause.

Prospective Juror No. 111 also made several statements during voir dire that,[7] when considered as a whole, provided a reasonable basis for the trial court to determine that his death

---

[7]     Defendant acknowledges that the trial court conducted a "careful voir dire."

penalty views would substantially impair his performance as a capital juror. For example, Prospective Juror No. 111 responded affirmatively to the prosecutor's question, "Is it fair to say that . . . in almost all cases you . . . could not find it appropriate to impose the death penalty?" Prospective Juror No. 111 also stated, "I just really have a hard time personally thinking that death is an appropriate penalty." And in discussing whether he could "consider voting for death," Prospective Juror No. 111 stated, "I think it's very unlikely." In addition, Prospective Juror No. 111 ruminated that he did not think that he would ever have enough "wisdom" to impose the death penalty. Taken together, such comments supported the trial court's excusal of Prospective Juror No. 111 for cause. (See *Mataele*, *supra*, 13 Cal.5th at p. 397 [examining juror's "written and oral responses to questions regarding her ability to impose the death penalty" "as a whole" to determine substantial impairment]; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1340 [prospective juror properly excused where "the totality of [the juror's] responses reflected doubts regarding her ability to make the penalty determination"]; see also *People v. Camacho* (2022) 14 Cal.5th 77, 135 (*Camacho*) [affirming excusal of prospective capital juror for cause where "she repeatedly made clear that it would be 'difficult' or 'very difficult' for her to vote for the death penalty"].)

In addition, in response to the trial court's questioning as to whether his "personal feelings" would "interfere with [his] ability to consider the options at either end," Prospective Juror No. 111 stated that he thought "the bar is going to be higher in terms of the need for substantial aggravating circumstances." In excusing Prospective Juror No. 111, the trial court referred to this exchange, remarking in part: "I accept the responsibility

for trying to put it in a way that was designed to think about if he followed the law, as he put it, and he did his weighing and he became convinced that the aggravating circumstances substantially outweighed the mitigating circumstances would he nevertheless feel compelled to impose his personal belief as a barrier, if you will — I put it narrowing the funnel — as a barrier to imposing the death penalty. And I didn't write down his exact answer, but, as I recall, he said yes, that's true. He's the one that came up with . . . the answer that yes, he would — the bar would be higher for him. And I took that to mean that the bar would be his personal beliefs which he had difficulty overcoming in considering the death penalty as a result."

The court further explained that it took the sum of Prospective Juror No. 111's comments to mean that his personal beliefs would make it difficult for him to apply the law. The court elaborated: "What do I get from all of this? [¶] I get a man struggling with his ability to accept the doctrines of law we would explain to him, to think about the fact that he might be under law and doing his duty feel compelled to reach a decision by the weighing process and then be prevented from doing it because of his personal beliefs. [¶] . . . I find . . . that his personal beliefs as a result of all this give and take and all these analogies would result in him being unable to follow the law and impair his ability to accept the responsibilities for this case."[8]

---

[8] We also observe that Prospective Juror No. 111's comments in voir dire about his "civic duty" could be understood to reflect a debilitating misunderstanding of a juror's role in considering the question of penalty. A juror's civic duty would never *require* a vote for execution, as the prospective juror seemed to believe. The prospective juror's civic duty, like that

Defendant contends the trial court misrepresented the prospective juror's statements and misapplied the law. As to the former, defendant provides an alternative interpretation of Prospective Juror No. 111's statements, arguing, "[Prospective] Juror No. 111 . . . did *not* say that his beliefs would *interfere* with his ability to impose the death penalty, he did acknowledge that they would *influence* his penalty decision." But the trial court, having listened to the responses and observed the prospective juror, was in the best position to evaluate the statements that were made in the context of the entire exchange. The trial court's summary does not misrepresent the prospective juror's statements as a whole.

Defendant also contends the trial court erroneously stated Prospective Juror No. 111 indicated during voir dire that "it was hard to think of, I guess, or suppose a case where he could impose [the death penalty]." Defendant maintains the trial court's statement was incorrect because, according to defendant, Prospective "Juror No. 111 said that he *could* think of cases — albeit not the majority of cases — in which he could impose the death penalty." The trial court did not incorrectly summarize the gist of the prospective juror's statements. While Prospective Juror No. 111 stated there was a chance that he could impose the death penalty in a case involving hypothetical charges like those alleged in this case, he also stated that in "the majority of the scenarios, I just really have a hard time personally thinking that death is an appropriate penalty." Prospective Juror

of any juror, would be to consider all the evidence with an open mind as to both potential punishments and follow the court's instructions as to how to approach the penalty question. His obligation would not be to abandon his own moral judgment in deference to a misapprehension regarding his civic duty.

No. 111 also stated that it was "very unlikely" that he could "consider voting for death." The trial court's summary of the prospective juror's statements was reasonable and did not amount to a misstatement.[9]

As far as purportedly misapplying the law, defendant contends the trial court erroneously believed that it would be disqualifying for a prospective juror to hold personal views of the death penalty that would render it more difficult for the prospective juror to find aggravating factors that warrant the death penalty than would be true of the average person. Defendant reasons this contravenes cases such as *People v. Kaurish* (1990) 52 Cal.3d 648, 699 and *People v. Martinez* (2009) 47 Cal.4th 399, 432. We do not discern any such misapplication from the trial court's statements. Instead, as outlined above, the trial court reasonably interpreted Prospective Juror No. 111's remarks as indicating that his personal views on the death penalty would impair him from imposing the death penalty *even if* he were to determine that the death penalty was warranted under the law. Substantial evidence supports the trial court's determination on this point, which constitutes a proper basis for striking a prospective juror for substantial impairment. (See *People v. Scully* (2021) 11 Cal.5th 542, 579 (*Scully*) [" 'excusal is proper when a prospective juror cannot

---

[9]     Further, Prospective Juror No. 111's statement pertaining to the circumstances under which he might be able to impose the death penalty as including "a bunch of children in a playground and a repeat offender" also did not demonstrate his fitness to serve as a capital juror. That is because " 'the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror' erroneous." (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 607–608.)

"consider and decide the facts impartially and conscientiously apply the law as charged by the court" ' "].)

Next, after noting that the trial court expressly commented on the demeanor of several other jurors in ruling on challenges throughout the voir dire process, defendant asserts the trial court's ruling "was not based on [Prospective Juror No. 111's] demeanor." Yet, the mere fact that the trial court expressly commented on the demeanor of other prospective jurors, but not Prospective Juror No. 111, does not relieve this court of its obligation to afford deference to the trial court's ruling. (See *People v. Poore* (2022) 13 Cal.5th 266, 298 (*Poore*) ["deference to [the trial court's] ruling [excusing prospective jurors based on their death penalty views] is appropriate even if the court did not specifically comment about their demeanor on the record"]; accord, *People v. Capistrano* (2014) 59 Cal.4th 830, 860 [noting the lack of "authority for the proposition that the trial court must spend a certain amount of time, give certain explanations, ask certain questions, or make findings on the record in support of its determination before a reviewing court applies the rule of deference" in evaluating a prospective juror's qualification to serve in a capital case].) Further, the record arguably reflects that the trial court did consider Prospective Juror No. 111's demeanor. For example, as noted *ante*, after reviewing Prospective Juror No. 111's statements during voir dire, including that the prospective juror had "launched into [a] distinction between his duty to follow the law and his personal beliefs," the trial court rhetorically asked, "What do I get from all of this? [¶] I get a man struggling with his ability to accept the doctrines of law we would explain to him." The trial court arguably was referring to the sum of all the information that the court received in assessing whether Prospective Juror No. 111

was qualified to sit as a juror, including his demeanor during voir dire. Regardless, even assuming the trial court did not rely on Prospective Juror No. 111's demeanor, there is substantial evidence in the record to support a finding of substantial impairment, as summarized above.

Defendant also contends Prospective Juror No. 111 "made no conflicting or equivocal statements about his ability to vote for death in a factually appropriate case." Again, the record does not support defendant's contention. In addition to the ambiguous answer given in connection with the trial court's pointed questioning pertaining to the funnel analogy discussed *ante*, Prospective Juror No. 111 also was equivocal with respect to whether the source of his opposition to the death penalty was his religious beliefs, and more importantly, whether such beliefs would prevent him from imposing the death penalty. Taken as a whole, the trial court could reasonably determine that Prospective Juror No. 111's equivocal "assurances that he would consider imposing the death penalty and . . . follow the law [did] not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case." (*Uttecht v. Brown* (2007) 551 U.S. 1, 18.) Given the substantial evidence of Prospective Juror No. 111's equivocal answers concerning his ability to serve as a capital juror, " ' "the trial court's findings as to [his] state of mind are binding" ' " on this court. (*Miles*, *supra*, 9 Cal.5th at p. 562.)

For all these reasons, we conclude there is substantial evidence in the record to support the trial court's excusal of

Prospective Juror No. 111 for cause due to his beliefs with respect to capital punishment.[10]

## B. The Trial Court Did Not Err in Denying Defendant's Request to Conduct Individually Sequestered Voir Dire

Defendant claims the trial court committed constitutional error in denying his request to conduct the entire death qualification voir dire in an individually sequestered manner. Specifically, he contends his constitutional rights to due process, equal protection, trial by an impartial jury, effective assistance of counsel, and a reliable death verdict required that the trial court grant his request. (See U.S. Const., 6th, 8th, & 14th Amends.; Cal. Const. art. I, §§ 7, 15, 16.) Defendant also asserts the court abused its discretion in denying his request and thereby violated his statutory right to individual voir dire where group voir dire is not practicable. (See Code Civ. Proc., § 223.) He maintains the trial court's error requires reversal of his death sentence. We conclude the trial court did not err.

### 1. *Governing law*

" 'Our decision in [*Hovey v. Superior Court* (1980) 28 Cal.3d 1] declared, pursuant to our supervisory authority

---

[10]    In light of this conclusion, we need not consider whether defendant is correct that Prospective Juror No. 111 held no "other" disqualifying beliefs. Nor do we need to consider the People's request that we reconsider our precedent holding that the erroneous excusal of a juror based on the juror's views on the death penalty requires per se reversal of the death judgment. (See *People v. Peterson* (2020) 10 Cal.5th 409, 435 [noting that People had made a similar request in their brief but had conceded that "*Gray v. Mississippi* [(1987)] 481 U.S. 648 is controlling and that error of this sort requires automatic reversal of the penalty judgment"].)

over California criminal procedure, that sequestered voir dire should be conducted in capital cases in order to promote candor and reduce the possibility that prospective jurors might be influenced by the questions to and responses by other prospective jurors. [Citation.] Code of Civil Procedure section 223, adopted in 1990 as part of Proposition 115, abrogated this aspect of our decision in *Hovey*.' [Citation.] [Code of Civil Procedure] [s]ection 223 provides in relevant part that '[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases.' (Code Civ. Proc., § 223.) Group voir dire may be considered ' "impracticable" ' where it has resulted in ' "actual, rather than merely potential, bias." ' [Citations.] We have repeatedly held that 'there is no federal constitutional requirement that a trial court conduct individualized, sequestered voir dire in a capital case.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 357 (*Jackson*).)

## 2. *Factual and procedural background*

Prior to trial, defendant filed a motion requesting individual, sequestered voir dire for death qualification. Defendant claimed individual sequestration was required due to the sensitive nature of the topic. He also maintained such individual sequestration was more practical than group voir dire and would ensure that jurors were not "taint[ed]" by the attitudes of other jurors. The trial court denied defendant's motion, stating it would "follow [Code of Civil Procedure section] 223 and . . . begin with open court voir dire, [and] move into chambers for anything that jurors wish to discuss or those that I feel are sensitive that are likely to cause difficulty."

Defendant later renewed his motion for individually sequestered voir dire on the ground that it would be "cumbersome" to continue with group voir dire given the frequency with which sensitive issues requiring individually sequestered voir dire were arising. The trial court denied the request, noting "voir dire must occur in the presence of all other jurors where practical in all criminal cases including death penalty cases." It added that many of the issues were not sensitive and would be addressed in a group voir dire setting. The court acknowledged that the case also involved some sensitive issues and that it would take those issues "into chambers . . . with all of you."

The court later clarified: "I'm not telling you that I'm simply going to take every death-qualifying question into chambers. I may ask [the prospective jurors] a question or two about — if somebody says I could never impose, I will never impose the death penalty and so forth, I might ask them an introductory question or two about that topic, and if I feel that we're going into an area that might be deemed sort of personal to that juror or might tend to broaden the topic beyond the question they answer, I will indeed go into chambers. [¶] The proposition that overruled [*Hovey*] made that very clear that you're not entitled to [*Hovey*] voir dire on death-qualifying questions, per se. I have to make individual calls on them."

3. *Analysis*

Defendant claims "the federal Constitution requires sequestered death-qualification voir dire of every prospective

juror in a capital case."[11] As noted in part II.B.1., *ante*, we have repeatedly rejected this claim. (See, e.g., *Jackson*, *supra*, 1 Cal.5th at p. 357.) Since defendant presents no persuasive arguments to reconsider our prior holdings, we adhere to our conclusion that " ' "[i]ndividual sequestered jury selection is not constitutionally required" ' " in all capital cases. (*People v. Hoyt* (2020) 8 Cal.5th 892, 914.)[12]

We also reject defendant's claim that the trial court abused its discretion under Code of Civil Procedure section 223 by denying his request for individual sequestered voir dire "under the circumstances of this case." The only argument defendant offers to support this claim is his assertion that "[t]he trial court gave no explanation of its decision to overrule appellant's request for individual sequestered voir dire about the death penalty," and thus the record does not reflect an exercise of discretion.

Contrary to defendant's assertion, the trial court *did* explain its reasons for denying defendant's request to conduct all the death qualification voir dire in an individually sequestered fashion, and it conducted portions of the voir dire in an individually sequestered fashion, thereby manifesting an exercise of discretion. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 634 [rejecting claim that trial court abused its discretion in determining whether group voir dire was

---

[11] We assume, for the sake of this opinion, that defendant did not forfeit his constitutional claim by failing to raise it in the trial court.

[12] In his brief, defendant acknowledges that this contention "has been frequently rejected by this court" and that he raises it here "to ensure federal review."

impracticable because the court's "remarks during voir dire confirm that its denial of the motion reflected careful consideration of the issue and that it properly exercised its discretion"].)  Thus, we reject defendant's contention that the record does not reflect that the trial court exercised its discretion in ruling on defendant's request for individually sequestered death qualification voir dire.

Finally, because "defendant nowhere states what questions he was unable to ask jurors as a result of the trial court's rulings, nor does he describe any specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias[,] . . . he has not established prejudice," as is required for reversal due to a violation of Code of Civil Procedure section 223.  (*People v. Navarette* (2003) 30 Cal.4th 458, 490; see Code Civ. Proc., § 223, subd. (g) ["The trial judge's exercise of discretion in the manner in which voir dire is conducted . . . is not cause for a conviction to be reversed, unless the exercise of that discretion results in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution"].)

## C. The Trial Court Did Not Err in Instructing the Jury on Flight

Defendant claims the trial court erred in instructing the jury concerning a defendant's flight from the scene of a crime. He maintains there was no factual basis for giving the instruction in this case.  Defendant also raises a series of arguments pertaining to a flight instruction generally, including that the instruction is argumentative and unnecessary, should not be given where the defendant concedes his identity, improperly allows the jury to draw an unreasonable permissive inference, and impermissibly lowers the People's burden of

proof. He maintains the trial court's error in providing the jury with such an instruction violated his state and federal constitutional rights and requires reversal. We conclude the trial court did not err in instructing the jury on flight.

### 1. *Standard of review and governing law*

"We review a claim of instructional error de novo." (*People v. Thomas* (2023) 14 Cal.5th 327, 382 (*Thomas*).)

"The giving of [a flight] instruction is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020, citing § 1127c.)[13] " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.] " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 285.)

---

[13] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

"No further instruction on the subject of flight need be given."

"[T]he instruction [does not] require[] . . . a defined temporal period within which the flight must be commenced . . . ." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182 (*Carter*); see *ibid.* [flight instruction proper where "the evidence introduced by the prosecution establish[ed] that defendant left California in the days immediately following the charged offenses"].) In *People v. Mason* (1991) 52 Cal.3d 909 (*Mason*), we noted that our cases concerning the sufficiency of evidence to support the giving of a flight instruction do not "create inflexible rules about the required proximity between crime and flight." (*Id.* at p. 941.) "Instead, the facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*Ibid.*)

### 2. *Factual and procedural background*

During the guilt phase of the trial, the trial court held a hearing outside the presence of the jury for the purpose of discussing potential jury instructions. At the hearing, the court read CALCRIM No. 372, a standard jury instruction regarding a defendant's putative flight from the scene of the crime. The court asked the prosecutor whether he was offering the instruction. After the prosecutor responded in the affirmative, defense counsel stated, "I don't think it applies."

The trial court heard argument regarding whether it should provide the jury with the instruction. The prosecutor argued, "Well, we know he was at the scene of the crime by independent witnesses, and right after the crime he wasn't there." Defense counsel contended there was no evidence of exactly when defendant left the trail area where the murder occurred. Counsel argued, "We don't know . . . when he left in between that time period where [the victim] was there and

eventually — not immediately — eventually, you know, an hour, hour-and-a-half later when the police arrive." Defense counsel continued, "So there's no evidence of immediate flight after the crime in this case." The defense added, " 'Immediately,' means within minutes, I think. Or maybe seconds."

The prosecutor argued it would be error for the trial court to fail to give the instruction, stating: "I've placed [defendant] at the scene by independent witnesses and by DNA evidence at the scene of the crime, and as — taking part in this act that ended with her death. I placed him there at the scene. And then a short time after he's not there. Now, what this instruction says is that's not enough alone to find him guilty, and that's why it's error to not give this." After further discussion, the trial court stated it would consider the issue further and "read the cases" before providing its "final answer" as to whether it would provide the instruction.

At a subsequent hearing, the court and counsel further discussed the propriety of giving a flight instruction. During that hearing, the trial court noted that, in *Mason*, this court stated that our decisions concerning this instruction do not "create inflexible rules about the required proximity between the crime and flight." After further discussion, the court indicated that it intended to provide the jury with the instruction but that it would give defense counsel an opportunity to provide further argument the following day. Defense counsel did not provide further argument.

The trial court ultimately instructed the jury: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the

meaning and importance of that conduct.  However, evidence that the defendant fled alone — cannot prove guilt by itself."

### 3. *Analysis*

We reject defendant's contention that there was no factual basis for the instruction.[14]  The record contains considerable evidence that defendant frequently spent time near the trail where Loreck was attacked. (See pt. I.A.1.b., *ante*.)  Moreover, on the day of the offenses, multiple witnesses identified defendant as being near the trail just before Loreck disappeared from the same location.  For example, one witness described defendant as "loitering" around the trail and explained that people usually walked or biked on the trail. Another witness saw defendant sitting near the side of the trail "kind of plucking at grass."  DNA evidence also confirmed defendant's presence at the scene of the crimes.

---

[14]    The People contend defendant forfeited all his challenges to the instruction.  While the People acknowledge that defendant objected in the trial court on the ground that there was insufficient evidence he had fled "immediately" after the crime, the People maintain that he did not raise the broader sufficiency challenge that he raises on appeal or any of the additional grounds against the giving of the instruction that he now asserts.  We consider the merits of all of defendant's contentions notwithstanding any potential forfeiture. (See, e.g., *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13 [rejecting forfeiture argument to claim regarding flight instruction given § 1259, which permits a court to review the propriety of a jury instruction, even when no objection was made below, if the defendant's substantial rights were affected].)

Yet, when a police officer discovered Loreck that afternoon,[15] within hours of her disappearance, defendant was no longer present. Defendant told police that, after the offenses, he did not "want to have nothing [*sic*] to do with that section of the trail anymore." Defendant's consistent and visible presence near the trail before the crime makes it more notable that he was not seen there afterward, and supports an inference that defendant left the scene because he did not want to be observed there after the crime.

The People also presented evidence that defendant struck Loreck on the head with an iron bar and dragged her from near the walking trail to a secluded area. As aptly summarized by the People, there is evidence in the record of defendant's "high visibility before the crime, clear intent to conceal the crime from view by dragging [the victim] to a secluded area, and absence from the scene shortly after the crime," from which "a jury could reasonably infer that [defendant] left to avoid being observed or arrested." This evidence was sufficient to warrant giving a flight instruction.

Defendant also raises several additional arguments relating to the flight instruction, namely that it: (1) unduly favored the prosecution and was argumentative; (2) should not have been given when, as here, identity is purportedly conceded; (3) permitted the jury to draw an impermissible inference; and (4) lessened the prosecution's burden of proof.

---

[15] The jury could reasonably find that the officer who found the victim did so no later than 3:25 p.m., in light of a crime scene investigator's testimony that she was dispatched to the crime scene at approximately that time.

These arguments are all foreclosed by precedent, and defendant offers no persuasive argument for revisiting such case law. (See, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 691 [stating that "[d]efendant also mounts several challenges to the standard [flight] instruction, including that it unduly favors the prosecution, is argumentative and duplicative, is inapplicable when identity is conceded, creates an improper permissive inference, and lessens the prosecution's burden of proof," and that "we repeatedly have rejected these claims"].) Accordingly, we reject defendant's additional arguments against the giving of the instruction.

Finally, while we need not consider prejudice given our conclusion that the trial court did not err in instructing the jury regarding flight, we conclude that any error in giving the instruction was harmless. Contrary to defendant's claim that error in giving a flight instruction violated his federal constitutional rights requiring per se reversal or, at a minimum, the application of the *Chapman*[16] standard of prejudice, we apply the *Watson*[17] standard of prejudice applicable to errors arising under state law to claims that a trial court erred in instructing a jury on flight. (See *People v. Silva* (1988) 45 Cal.3d 604, 628 ["we believe that under the evidence, any error in instructing on flight was harmless; on these facts it is not reasonably probable a result more favorable to defendant would have been reached absent such an error," citing *Watson*].)

---

[16]    *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].

[17]    *People v. Watson* (1956) 46 Cal.2d 818, 836.

Applying that standard, it is not reasonably probable that defendant would have obtained a more favorable result had the flight instruction not been given. The instruction "did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it." (*Carter*, *supra*, 36 Cal.4th at pp. 1182–1183; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1020 ["the instruction applied only *if* the jurors found flight had been shown; if they did not so find here, they would have disregarded the flight instruction as they were also instructed"].) Further, the instruction cautioned the jury against giving undue weight to alleged flight. (See *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [noting the cautionary aspects of a flight instruction].) In addition, "[e]ven had the jury not been instructed [on flight], it would still have been aware of defendant's flight." (*People v. Moon* (2005) 37 Cal.4th 1, 28.) Finally, the People presented compelling evidence that defendant committed the charged crimes and that the special circumstance allegations were true, including that defendant's DNA was found on the murder weapon and on vaginal and rectal swabs taken from the victim, and several witnesses placed defendant near the victim at the time the offenses occurred.

## D. The Trial Court Did Not Err in Denying Defendant's Self-representation Requests at the Penalty Phase of the Trial

Defendant claims the trial court erred in denying his requests to represent himself at the penalty phase of the trial. Specifically, defendant maintains that, in denying his requests, the trial court violated his right to self-representation under the federal Constitution as established by *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). Alternatively, defendant claims

the court abused its discretion in denying his requests under *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*). He further claims the penalty verdict must be reversed as a result of these errors.[18] We conclude the trial court did not err in denying defendant's requests.

### 1. *Governing law*

"The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. (*Faretta, supra,* 422 U.S. at pp. 835–836.) A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently." (*People v. Wright* (2021) 12 Cal.5th 419, 435–436 (*Wright*).)

"In the context of a capital case, we have held that a *Faretta* motion made after the guilt phase verdicts have been returned is untimely. (*People v. Hardy* [(1992)] 2 Cal.4th [86,] 193–195 [motion made seven days prior to commencement of penalty phase]; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1365 . . . ['a motion made between trial of the two phases [of a capital trial] is untimely']; *People v. Hamilton* (1988) 45 Cal.3d

---

[18] While defendant also summarily asserts the trial court's ruling violated his rights to due process and a fair and reliable capital sentencing hearing, his brief does not present any reasoned argument in support of these contentions. Accordingly, as does defendant, we focus on the trial court's purported violation of his right to self-representation under the federal Constitution as well as the court's alleged error in denying his motion for self-representation pursuant to *Windham*. (See *Nunez and Satele, supra,* 57 Cal.4th at p. 51.)

351, 369 . . . ['the penalty phase has no separate formal existence but is merely a stage in a unitary capital trial'].)" (*Thomas, supra,* 14 Cal.5th at p. 397.)

We have previously stated that "[w]hen a defendant's motion [for self-representation] is untimely, the motion is 'based on nonconstitutional grounds' ([*Windham, supra,* 19 Cal.3d] at p. 129, fn. 6) and it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*' (*id.* at p. 124; see also *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 . . . [stating a 'midtrial motion for self-representation did not have a constitutional basis'].)" (*Thomas, supra,* 14 Cal.5th at p. 397.) "Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham,* at p. 128.)

### 2. *Factual and procedural background*

On June 21, 2006, shortly after the jury returned its guilty verdicts, and outside the presence of the jury, defense counsel informed the trial court that defendant might seek to represent himself at the penalty phase of the trial. Counsel explained she needed time to confer with defendant and requested that the court set a hearing to discuss the issue. The court agreed to set the hearing and to refrain from calendaring the penalty phase until holding such hearing.

On June 23, the trial court set July 31 as the date the jury would return for the penalty phase of the trial. At the end of

that hearing, defendant stated: "I think it's necessary to go on the record saying that although I'm not submitting a *Faretta* motion to the [c]ourt presently, I reserve my right to do so at a future time prior to the commencement of the penalty phase trial. And if I choose to do so it will be in both unequivocal [*sic*] and timely manner which will cause no significant delay, if any at all."

On July 26, the trial court held a hearing to consider the defense's in limine motion to admit certain videotapes during the penalty phase trial. One videotape pertained to expert testimony the defense intended to present on attachment theory, including a discussion of a study in which monkeys were deprived of contact with their mothers. The defense also sought to play a second videotape that would contrast the differences between defendant's upbringing and that of his brother, who was raised in a different household. Defense counsel explained that defendant's brother "was raised in a loving, nurturing and committed environment, whereas [defendant's upbringing] took a different direction." During the discussion of this second videotape, defendant interjected and stated, "I object to this, and I'm putting in a motion to appoint new counsel."

The court responded that it would hear defendant's motion after defense counsel finished her presentation. Defense counsel continued discussing the differences in the households in which defendant and his brother were raised. After counsel described one member of defendant's household as "dysfunctional," and a second as "bipolar," defendant interjected, "Your Honor, I object again, and I move for a mistrial because my motion for appointment of counsel is not being heard." The court responded, "It will be, sir, if you wish to renew it, but since you're obviously upset, it seems to me,

about some of the material you're hearing, I'd like to make sure you hear it all."

Shortly thereafter, the following colloquy occurred:

"THE DEFENDANT:  And I'll be filing a *Faretta* motion so you can hear that.

"THE COURT:  I'm going to let the parties put on a full record of what the current lawyers intend to offer and then I'll listen to you.

"THE DEFENDANT:  I'd like to represent myself from this point forward.

"THE COURT:  I'm going to determine the point.  I'll listen to that motion.

"THE DEFENDANT:  Then I move for a mistrial for the [c]ourt denying me my Sixth Amendment right to represent myself.

"THE COURT:  Any motion for a mistrial at this point is denied."

After defendant continued to indicate a desire to be heard, the court noted that defendant appeared to be a "little animated, perhaps concerned."  The court recessed the hearing to allow defendant to speak with his counsel.

Upon resumption of the hearing, defense counsel indicated that defendant wished to make a *Marsden*[19] motion to discharge counsel and appoint substitute counsel.  During the *Marsden* hearing, defendant stated that he felt that the approach defense counsel was taking during the penalty phase "misrepresent[ed]"

---

[19]  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

him.  Defendant explained he was "not trying to get by the legal system by presenting cheap emotionalism."

After permitting defense counsel to respond to defendant's comments, the court denied defendant's *Marsden* motion. Defendant responded, "I'm not going to file a *Faretta* motion today until I have a chance to confer with my remaining counsel."

On July 31, the date the penalty phase trial was scheduled to commence, defendant filed a handwritten motion requesting that he be allowed to represent himself, along with an accompanying declaration and supporting brief.  In his declaration, defendant stated he was voluntarily and intelligently requesting permission to act as his own counsel and he was aware of the dangers of proceeding without court-appointed counsel.  Defendant also asserted that his motion was timely.

The trial court held a hearing on the motion, noting at the outset that given the procedural posture of the matter, "under case law this is not timely."  The court explained that the untimely nature of the motion was "not the end of the considerations," but that it must be considered.  Defendant noted his motion seeking to represent himself was based in part on his disagreement with "appointed counsel's intention to mitigate the why of this sickening crime I've been convicted of." He stated that, in his view, "promoting the theory that [he is] a product of a dysfunctional family while projecting images of maternally-deprived apes is likely to be considered by the jury as pure monkey business rather than [a] mitigating factor." Defendant explained that, instead, he wished to present to the jury evidence of "how [his] friends and loved ones will be affected

if [the jury] decided to have [him] executed." Defendant added that if the court were to grant his motion he did not "anticipate any delays or disruptions which will take this final phase beyond the time frame that defense counsel has already estimated."

The trial court denied defendant's motion, emphasizing it was not timely. The court stated: "[W]ithout reciting the history of this trial, this case took five or six weeks to pick a jury, five or six weeks to try. We've had an interval of five weeks. We've had by [defense counsel's] assessment, large amounts of detail, exhaustive preparation. Neither [defendant] nor I nor counsel can predict what the results of that preparation will be, but the point is it appears to be extensive, relevant, and intensive." The trial court also ruled that defendant's request was equivocal. It characterized defendant as not satisfied with counsel's planned approach during the penalty phase and that he was "angry" and "upset."

Immediately following the court's denial of his motion, defendant moved for a mistrial. The court denied the motion, pointing to the likely delay in proceedings that granting the motion would engender.

On August 1, defendant asked the court to reconsider its ruling denying his motion for self-representation. Defendant argued the court had failed to conduct a "sua sponte inquiry" in denying his motion. Defendant maintained the court was therefore "unaware" that he had considered defense counsel's planned case in mitigation. He explained his "strategy would not have included such complicated issues," which he "believe[d] likely would only anger the jury, ultimately costing [him his] life." Defendant also argued his motion "should be considered

41

timely," as he had given notice that he would likely file the motion "weeks before the commitment [*sic*] of the penalty phase." The court denied the motion, reiterating its remarks from the prior hearing and emphasizing that defendant's motion was untimely. Defendant moved for a mistrial and the court denied that motion as well.

On August 3, after the penalty phase jury trial had begun, defendant made an oral motion to represent himself at a hearing outside the presence of the jury. Defendant stated he would not object if the court were to appoint "stand-by counsel." He also requested the court consider "the slanderous effects another denial will permit." Defendant explained the denial of his request would allow for the dissemination of the claim that, as a child, defendant had been molested by an uncle (which defendant asserted was false). Finally, defendant disputed the suggestion that he had "a genetic brain abnormality."

The trial court incorporated by reference its remarks in denying defendant's previous motions for self-representation. It noted that standby counsel would require a significant amount of time to "catch up with the record," unless defendant's current counsel were to be appointed as standby counsel. The court added that it understood that defendant disagreed with defense counsel's intention to present certain pieces of evidence. In addition, the court stated its view that defendant's claim that he had no brain disorder was "belied by what counsel" indicated they were going to prove. The court underscored that it was "late in the proceedings," and denied the motion.

On August 9, defendant "reiterated [his] desire to proceed pro per at this portion of the penalty phase," adding that "[t]here would be no delays." Defendant explained he had asked to

represent himself "since July 31st," and the court had denied the motions because "it would cause delays and it was ambivalent." The court responded, "And that it was late." After further discussion, the court denied the motion "[f]or the reasons I've previously stated." Defendant again moved for a mistrial, which the court denied.

During another hearing later that same day outside the presence of the jury, after a witness testified that, as a child, defendant had told the witness that defendant's uncle had been "touching him," defendant again renewed his request to represent himself, explaining that he disagreed with counsel's approach in soliciting such testimony. The trial court responded that defendant's counsel were "doing a competent job" of representing him and that defendant's request to represent himself continued to be late. The court denied the renewed motion for self-representation and, thereafter, denied defendant's mistrial motion.

On August 10, defendant made another request to represent himself and asked the trial court to allow him to "prepare and give a statement to the jury without the assistance of appointed counsel." The trial court again denied defendant's renewed request. The court also stated that defendant would not be allowed to present an uncross-examined statement to the jury.

After defendant stated he would be allowed to make such a statement if he was representing himself, the court responded: "No. Even if you were representing yourself, you would have to come to the stand and be cross-examined. So that wouldn't make any difference. [¶] You may argue your case, of course, at

the end, if you were representing yourself. That's a little different than pronouncing evidence from the witness seat."

On August 14, at a hearing outside the presence of the jury, defense counsel indicated that defendant wished to make a combination *Marsden/Faretta* motion. The trial court held a hearing at which defendant requested the court grant his "*Marsden* or *Faretta* motion." After hearing defendant's argument that defense counsel was providing "ineffective representation," the court denied defendant's *Marsden* motion and stated that it would hear defendant's *Faretta* motion after a lunch recess.

At the hearing on his *Faretta* motion, defendant explained he agreed "in part" with his counsel "it would not be conducive to my case if I were to testify." However, defendant argued "this issue would be moot if I was allowed to proceed pro per with my present team as stand-by counsel." Defendant explained this would allow him to "make the closing arguments and not be subject to cross-examination."

After allowing defendant to make a record of the reasons for his request, the trial court again denied defendant's motion for self-representation. The court incorporated its prior rulings and explained that defendant's request continued to be untimely. In addition, the court stated it appeared defendant's request was not unequivocal since it appeared to be premised on his present counsel being appointed as standby counsel, which the court explained could not be "assured . . . would happen" were the court to grant defendant's motion.

The following day, defendant again requested that the court grant "a *Marsden* or *Faretta* motion." Defendant argued that, to discourage him from testifying, defense counsel had

issued him an "ultimatum to take the stand before any other witnesses . . . without adequate time for preparation." Defendant argued this was "ineffective counsel." Defendant added that he had no objection to the appointment of standby counsel if the court were to grant a *Faretta* motion and deem such an appointment necessary. Defense counsel responded by explaining that she wanted to have defendant testify before an expert who had conducted a psychiatric evaluation of defendant.

Following further discussion between the trial court and defendant concerning the nature of his "*Marsden* slash *Faretta* motion," including whether defendant's decision to testify was dependent on the court's ruling, the court denied the motion. The court explained that the motion continued to be "late" and that it appeared to be equivocal in "the sense that you're telling me that certain decisions you're going to make will be based on what I do." The court stated that the issue of whether defendant intended to testify was not "abundantly clear," and the court acknowledged that it could not say that it "completely underst[ood]" defendant on this issue. However, the court stated that it still regarded the *Faretta* motion as equivocal in that defendant would "prepare one way if you have counsel and one way if you don't have counsel." As to the *Marsden* motion, the trial court ruled that defendant had not made a sufficient showing of ineffective representation.

The following day, at a hearing outside the presence of the jury, defendant stated that his decision not to testify had been made under "duress," which was related in part to the trial court's denial of his *Faretta* and *Marsden* motions. The court responded by stating it disagreed with defendant's characterization and added "if this is construed by anybody as a renewed *Faretta* motion, it is denied."

### 3. *Analysis*

Defendant raises several related claims of error regarding the denials of his motions for self-representation. First, defendant broadly claims that a criminal defendant has a constitutional right to self-representation so long as the assertion of that right would not unjustifiably disrupt the trial or obstruct the administration of justice. In support of this claim, he contends that the "reasonable time requirement"[20] for asserting the right to self-representation that this court first established in *Windham, supra,* 19 Cal.3d at page 128 may only be used to deny a defendant the right to self-representation where such assertion would obstruct justice. We have recently rejected this claim. (See *People v. Bloom* (2022) 12 Cal.5th 1008, 1057 (*Bloom*) [concluding that defendant's claim that "a belated request must be granted unless it would entail undue delay or interfere with the orderly administration of justice" was "without merit"]; accord, *Thomas, supra,* 14 Cal.5th at p. 398 [refusing to "adopt a rule that a self-representation request is assumed to be timely if the defendant does not request a continuance or cause future delay," citing *Bloom*, at p. 1057].)

As we explained in *Bloom*, for many years since *Faretta*, "this court and others have concluded that that right [of self-representation] is not absolute if not exercised until the eve of, or after the onset of, trial." (*Bloom, supra,* 12 Cal.5th at

---

[20] By using the phrase "reasonable time requirement," we refer to our holding in *Windham* "that in order to invoke the constitutionally mandated unconditional right of self-representation, a defendant in a criminal trial should make an unequivocal assertion of that right within a *reasonable time* prior to the commencement of trial." (*Windham, supra,* 19 Cal.3d at pp. 127–128, italics added.)

pp. 1057–1058.) And where a defendant has brought an *untimely* motion that is therefore subject to the court's discretion, a court exercising such discretion may consider not only " 'the potential for delay and disruption' but also 'whether the potential disruption is likely to be aggravated, mitigated, or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for the request, and the defendant's proclivity for substituting counsel.' " (*Id.* at p. 1058.) Defendant offers no persuasive reason for us to reconsider our prior precedent.

Relatedly, defendant maintains that this court's interpretation of the timeliness requirement for an assertion of a defendant's federal right to represent oneself violates the federal Constitution. Specifically, defendant maintains that the distinction we first drew in *Windham* between assertions of the right to self-representation made pretrial and those made during trial "is an unreasonable interpretation of the *Faretta* decision and should not be followed." We are not persuaded by defendant's argument. As we explained in *Windham*, federal cases both before and after *Faretta* drew this same distinction. (See *Windham*, *supra*, 19 Cal.3d at pp. 126–128.) And in the wake of *Windham*, "We have repeatedly held that a *Faretta* motion may be denied if not made within a reasonable time prior to the commencement of trial. [Citations.] . . . Defendant does not present a persuasive reason to revisit precedent on this matter." (*Wright*, *supra*, 12 Cal.5th at p. 440.)[21]

_____

[21] In addition, defendant acknowledges that "the discretionary aspect of the *Windham* decision essentially has been adopted by all federal jurisdictions when applying *Faretta*

In addition to these general claims regarding our jurisprudence in this area, defendant further argues that the trial court erroneously denied his initial motion for self-representation and his renewals of that motion made throughout the penalty phase of the trial, and thereby violated his federal constitutional right under *Faretta* because the motion was timely, unequivocal, and knowingly and intelligently made. For the reasons described below, we conclude that defendant's motion for self-representation was untimely as a matter of law under well-established precedent.[22]

Defendant concedes that the trial court's rulings concluding that his motion was untimely were "consistent with decisions of this court." Specifically, he acknowledges that his motion was untimely pursuant to the "unitary-capital-trial rule" because it was brought during the penalty phase of his trial, and thus after the commencement of the unitary capital trial. However, he "urges the [c]ourt to reconsider the strict application of the unitary-capital-trial rule in evaluating the timeliness of motions for self-representation at the penalty phase of a capital case."

---

to a self-representation request that is made after the start of trial."

[22] We have not specified a standard of review that "a reviewing court should apply in determining whether a defendant's request for self-representation is timely." (*People v. Johnson* (2019) 8 Cal.5th 475, 501; see also *Thomas, supra,* 14 Cal.5th at p. 398, fn. 22 [noting the unresolved issue].) As in *Johnson*, "[w]e need not decide whether de novo review or a more deferential standard is appropriate, however, because defendant's claim fails under either standard." (*Johnson*, at p. 501.)

We recently applied the unitary-capital-trial rule in concluding that a motion for self-representation filed after the guilt phase on the day before the penalty phase was to begin "falls squarely into the category of motions we have deemed to be untimely." (*Thomas*, *supra*, 14 Cal.5th at p. 398, citing *People v. Lynch* (2010) 50 Cal.4th 693, 722 (*Lynch*) and *People v. Hardy* (1992) 2 Cal.4th 86, 193–194 (*Hardy*).) And, as we noted in *Thomas*, "[w]e have repeatedly held that a *Faretta* motion made on the eve of trial or after commencement of the guilt phase is untimely." (*Thomas*, at p. 398 [collecting cases].)

We have previously explained the basis for the unitary-capital-trial rule with respect to motions for self-representation, stating that "the penalty phase has no separate formal existence but is merely a stage in a unitary capital trial," and "the connection between the phases of a capital trial is substantial and not merely formal." (*People v. Hamilton* (1988) 45 Cal.3d 351, 369.) And we have rejected claims that *Hamilton* was "wrongly decided" and is inconsistent with United States Supreme Court precedent. (*Hardy*, *supra*, 2 Cal.4th at p. 194 [distinguishing *Bullington v. Missouri* (1981) 451 U.S. 430 and stating "[t]hat the penalty phase of a capital trial may be a 'separate trial' for purposes of the double jeopardy clause, however, does not necessarily require that we conclude Hardy's post-guilt-phase *Faretta* motion was made 'within a reasonable time prior to the commencement of trial' "].)

Defendant presents no basis for reconsidering this well-established precedent. Accordingly, we conclude the trial court did not err in applying that law to deny defendant's motion for

self-representation as untimely.[23]   We further conclude that, having properly determined defendant's motion for self-representation was untimely, the trial court did not violate defendant's federal constitutional right under *Faretta.* Therefore, we need not consider whether the motion was unequivocal and knowingly and intelligently made.  (See *People v. Stanley* (2006) 39 Cal.4th 913, 931 [noting that a "trial court must grant a defendant's request for self-representation if three conditions are met," including timeliness].)

Next, defendant argues that "even assuming the motion was untimely," the trial court abused its discretion under *Windham* in denying it.[24]   "When a defendant's motion is untimely . . . it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se.*' "  (*Thomas*, *supra*, 14 Cal.5th at p. 397, quoting *Windham*, *supra*, 19 Cal.3d at p. 124.)

As alluded to in part II.D.1., *ante*, in exercising its discretion under *Windham* to consider an untimely motion for self-representation, " 'the trial court should inquire into the

---

[23]   Since defendant's motion for self-representation was brought after the commencement of the guilt phase trial, we need not consider whether the motion would have been timely under the factors outlined in *Lynch*, *supra*, 50 Cal.4th 693 for determining whether a motion for self-representation is made " 'a reasonable time *prior* to the commencement of trial.' "  (*Id.* at p. 722, italics added, quoting *Windham*, *supra*, 19 Cal.3d at p. 128.)

[24]   While at times in his brief defendant refers to his motion for self-representation in the singular, his arguments pertain to his initial request and his subsequent renewals of that request. Accordingly, we consider defendant's arguments as to all his requests made throughout the penalty phase trial.

defendant's reasons for the request[s]' and should consider factors including ' "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." ' " (*Thomas, supra*, 14 Cal.5th at p. 399.)

Applying these principles, we conclude the trial court reasonably determined the factors weighed against granting defendant's motion. First, the quality of counsel's representation of defendant weighed against granting his requests. The trial court commented on the skill of defense counsel and noted that she had conducted an "exhaustive preparation" for the penalty phase. Although the court did not comment on defendant's proclivity to substitute counsel, we agree with the People that there is at least some evidence that this factor also weighs against defendant, in that he filed a *Marsden* motion before filing his first *Faretta* motion, and his renewed *Faretta* requests were intermingled with additional *Marsden* motions.

Second, regarding the reason for defendant's requests, while defendant may have had a genuine disagreement with counsel as to their penalty phase approach, it also appears part of this disagreement was rooted in defendant's desire to present a defense that was not legally cognizable. Specifically, while defendant explained he wanted to represent himself to be able to present evidence of "how [his] friends and loved ones will be affected if [the jury] decided to have [him] executed," this court has repeatedly ruled that " '[t]he impact of a defendant's execution on his or her family may not be considered by the jury in mitigation.' " (*People v. Williams* (2013) 56 Cal.4th 165, 197

(*Williams*); accord, *Camacho*, *supra*, 14 Cal.5th at p. 142 [describing this court's case law on this point as "unwavering"].) Further, while defendant at one point stated that he wanted to represent himself so he could present a statement to the jury and "not be subject to cross-examination," the trial court reasonably noted that any such statement would not be allowed if he were "testifying" or "adding facts to the case." Thus, defendant's stated reasons for wanting to represent himself do not demonstrate that the trial court abused its discretion.

Third, the length and stage of the proceedings also weighed heavily against granting defendant's untimely *Faretta* motions. And, finally, while defendant argues there was no evidence that his requests were made for the purpose of delay, the trial court reasonably determined that disruption or delay " ' "might reasonably be expected to follow the granting of such a motion." ' " (*Thomas*, *supra*, 14 Cal.5th at p. 399; *id.* at p. 400 [trial court did not abuse its discretion in determining "defendant's self-representation carried with it some potential for disruption based on the stage of the proceedings"].) In sum, we conclude the trial court reasonably exercised its discretion under *Windham* in denying defendant's request.

### E. The Trial Court Did Not Err in Denying Defendant's Requests to Represent Himself at the Hearing on his Automatic Motion to Modify the Death Verdict (§ 190.4, subd. (e)) and at the Sentencing Hearing

Defendant similarly claims the trial court violated his federal constitutional right to self-representation by denying his requests to represent himself at the hearing on his automatic

motion to modify the death verdict (§ 190.4, subd. (e))[25] and at the sentencing hearing.[26]  As a result, he contends he is entitled to a new hearing on the section 190.4, subdivision (e) automatic motion and a new sentencing hearing.[27]  We disagree.

### 1.  *Factual and procedural background*

The jury rendered its death verdict on August 24, 2006. That same day, the trial court set sentencing for October 27.  On October 20, the court held a hearing with counsel and advanced the sentencing hearing date to October 26.  Defense counsel informed the court that she would be seeking a continuance of the sentencing hearing.  On October 26, the trial court granted defense counsel's request to continue sentencing until

---

[25]  Section 190.4, subdivision (e) provides in relevant part, "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . ."

[26]  As with his claim pertaining to the denial of his right to self-representation at the penalty phase of the trial, while defendant also summarily asserts the trial court's ruling violated his rights to due process and a fair and reliable capital sentencing hearing, he does not present any reasoned argument in support of these contentions.  Accordingly, as does defendant, we again focus on the trial court's purported violation of his right to self-representation under the federal Constitution as well as under *Windham*, *supra*, 19 Cal.3d 121.  (See *Nunez and Satele*, *supra*, 57 Cal.4th at p. 51.)

[27]  Defendant does not seek a new hearing on his motion for new trial, notwithstanding that the hearing on the motion for new trial was held on the same day as the hearing on his automatic motion to modify the death verdict (§ 190.4, subd. (e)) and the sentencing hearing.

December 15.  Defendant appeared in court that day and agreed with the request to continue the sentencing hearing.

Before the October 26 proceeding ended, defendant requested a hearing pursuant to section 4007, which authorizes the housing of a county jail inmate in state prison under certain circumstances.[28]  The trial court commenced a hearing under section 4007 that day and continued the hearing until December 8.

At the December 8 hearing, defendant informed the court that he was "going to be making a motion to proceed pro per on this hearing."  Defendant later expressed his desire not to be returned to county jail, stating, "I'm entirely against that idea, your Honor, and I haven't been able to explain why because I haven't had a chance to make my *Faretta* motion."  Shortly thereafter, defendant stated:  "According to [section] 4007, I have a right to be present at this hearing and represented by counsel, which also means I have the right to waive that right. [¶]  I no longer wish to be represented by this counsel.  I haven't been wanting to be represented by them since the beginning of the penalty phase, and there are very important issues that can be preserved in this hearing that I don't want to just let rot away with me."

After the court clarified, "So you wish to make a further *Faretta* motion at this time?"  Defendant responded in the affirmative.  The court stated that it would hold a hearing outside the presence of the prosecutor and the public, noting

---

[28]    The parties agree that on August 24, 2006, the day of the death verdict, defendant had been transferred from county jail to state prison pursuant to the statute.

that it would "begin with any *Marsden* issues" related to defendant's request.

After a discussion of defendant's dissatisfaction with counsel's representation at the section "4007 hearing," the trial court denied defendant's putative *Marsden* motion to relieve counsel. The court asked defendant, "Are you asking me to further address your desire to have [counsel] relieved for representation in the concluding aspects of this case next year, or are you limiting it to the 4007 hearing?" Defendant responded, "Well, I'm making an unequivocal request to proceed pro per."

The court observed that "[w]e're very late in these proceedings," which "reflects on the *Faretta*." The court added, "I don't have to repeat that. I've said that already." After noting that the main issues remaining in the case were defendant's new trial motion and the automatic request to modify the death verdict (§ 190.4, subd. (e)), the court asked defendant if there was anything else he wanted to say concerning his request. Defendant responded, "I'm just of the opinion that I can get myself executed just as easily as they can. And I feel that I have enough knowledge about what I want to present in the 4007 hearing to proceed in a way that will be in accordance with the court rules, and I have a Sixth Amendment right to do that, and that's what I'm standing on."

Defendant added that defense counsel had not given him "the sealed records in all of the in-camera hearings that we've had." He stated that while the trial court had denied his requests at the penalty phase, "this is not an untimely request," as it was being made "right here at the hearing." Defendant added that there are "appellate issues here," and that while "this

4007 hearing is not for the purpose of finding them, . . . it does preserve those issues." Defendant maintained that "without effective representation bringing these up, [he stood] to lose those things" and that he was "the best person to represent [himself] at these proceedings." Defendant also read into the record letters he had sent to counsel discussing his concerns regarding counsel's representation in connection with the section 4007 hearing.

In ruling on defendant's motion for self-representation, the trial court found that defendant was "making a[n] unequivocal request today." However, the court ruled that the request was "not timely" and "quite late in the proceedings." The court added that cases supported the proposition that "after the guilt phase you do not a have a constitutional right to self-representation." The court further remarked that although it found that defendant was acting voluntarily, it did "not feel that [defendant was] capable of representing [himself] in this closing stage of these proceedings with . . . these highly technical issues." The court continued, "But more than any other issue, I will find that this simply is not timely at this point, and the *Faretta* motion is denied."

Seven days later, on December 15, the trial court held a hearing on defendant's new trial motion and his automatic motion to modify the death verdict (§ 190.4, subd. (e)), and thereafter sentenced him. During the discussion of his motion for new trial, defendant stated, "Your honor, I object to these proceedings, and I want to make a pro per motion. I don't even want this motion read until that hearing takes place." In response to the court's request for clarification as to whether defendant was "mak[ing] another motion to represent [himself] in these proceedings," defendant stated, "As I've been doing

since the beginning of the penalty phase, your Honor." The court asked defendant whether he would like to inform the court of anything that it had not previously heard. Defendant stated there was "no requirement" that a criminal defendant demonstrate that his counsel "is providing effective [*sic*] representation" before self-representation is permitted. Thereafter, after "incorporat[ing] the findings [it] made last time," the trial court denied defendant's motion for self-representation.

### 2. *Analysis*

At the outset, we consider the date on which defendant first sought to represent himself for the hearing on the automatic motion to reduce the verdict (§ 190.4, subd. (e)) and sentencing. Noting that the focus of defendant's request on December 8 was to represent himself during the then-ongoing proceeding under section 4007, the People argue defendant first requested to represent himself for purposes of the section 190.4, subdivision (e) motion and sentencing a week later, on December 15 at the sentencing hearing itself. While the record is ambiguous, we assume defendant is correct that, on December 8, he first requested to represent himself at the hearing on the automatic motion to reduce the verdict (§ 190.4, subd. (e)) and at sentencing. Nevertheless, for the reasons that follow, we conclude the trial court did not err in ruling that defendant's postverdict *Faretta* motions were untimely.[29]

Defendant properly notes that this court has not determined whether, for purposes of determining the timeliness

_____

[29] In light of this determination, we need not consider whether defendant's request was unequivocal and knowingly and intelligently made.

of a *Faretta* motion, proceedings after a death verdict are deemed separate proceedings from the guilt and penalty phase. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 810 (*Mayfield*); *People v. Doolin* (2009) 45 Cal.4th 390, 454 (*Doolin*).) Consistent with our prior precedent, we assume for the sake of argument that a self-representation motion brought after a death verdict is not governed by the unitary-capital-trial rule and *may* be timely if made a reasonable time before the postverdict proceedings in which such self-representation is sought. (See *Mayfield*, *supra*, 14 Cal.4th at p. 810 ["assum[ing] for the sake of argument that a postverdict self-representation motion may be timely if made a reasonable time before sentencing," but "agree[ing] with the trial court that defendant's motion was untimely"]; see *Doolin*, *supra*, 45 Cal.4th at p. 454 [same].)

However, even assuming defendant's requests were not *per se* untimely pursuant to the unitary-capital-trial rule, we conclude they were *in fact* untimely — considering the "totality of the circumstances" surrounding such requests (*Lynch*, *supra*, 50 Cal.4th at p. 726) — because they were not made within a reasonable time prior to the December 15 proceedings. Not only did defendant wait until December 8, more than three months after the jury rendered its penalty phase verdict on August 24 to raise a request for self-representation at the postverdict hearings, which were to occur the following week, the record indicates that he had "earlier opportunities to assert his right of self-representation" (*ibid.*), including on October 26 when he was in court. Moreover, defendant's argument on appeal that his December 8 *Faretta* request was prompted by his dissatisfaction with counsel's performance in representing him in connection with the section 4007 hearing that day (and thus was made at the earliest opportunity) is not supported by

defendant's comment that day stating, "I haven't been wanting to be represented by [counsel] since the beginning of the penalty phase." Accordingly, we conclude that the trial court did not abuse its discretion in determining defendant's request was untimely.[30]

Next, we consider and reject defendant's claim that the court abused its discretion under *Windham* in denying his untimely requests to represent himself. While the trial court did not expressly consider all the *Windham* factors, this circumstance does not mandate reversal, as defendant acknowledges. Further, several of the *Windham* factors support the trial court's rulings, including defendant's failure to articulate a compelling reason for his request (i.e., "[he could] get [him]self executed just as easily as [counsel could]"), the late stage of the proceedings, and the possibility of delay. (See *Windham, supra,* 19 Cal.3d at p. 128 [listing factors to be considered in assessing a motion for self-representation made after the commencement of a trial].) In addition, defendant fails to identify any deficiency with the "quality of counsel's representation" that would support his claim of an abuse of discretion. (*Ibid.*) Accordingly, we conclude the trial court did not abuse its discretion in denying defendant's requests to represent himself at the postverdict proceedings.

---

[30] Defendant's December 15 renewed request, made on the day of the postverdict proceedings, was "manifestly untimely." (*Doolin, supra,* 45 Cal.4th at p. 454.)

### F. The Trial Court Did Not Violate Defendant's Sixth Amendment Right to Choose the Objective of His Defense

Defendant claims the trial court violated his Sixth Amendment right to choose the objective of his defense by permitting counsel, over defendant's objection, to present several pieces of mitigating evidence during the penalty phase. As a result, defendant contends that he suffered a violation of his Sixth Amendment right to the assistance of counsel. (U.S. Const., 6th Amend.) We reject this contention.

#### 1. *Governing law*

"The Sixth Amendment guarantees to each criminal defendant 'the Assistance of Counsel for his defence.' " (*McCoy v. Louisiana* (2018) 584 U.S. 414, 421 (*McCoy*).) As the *McCoy* court explained, "To gain assistance, a defendant need not surrender control entirely to counsel." (*Ibid*.) "Some decisions . . . are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id*. at p. 422.) "Autonomy to decide that the objective of the defense is to assert innocence belongs in this . . . category." (*Ibid*.)

At the same time, the *McCoy* court also reaffirmed that "[t]rial management is the lawyer's province," and thus counsel may decide " 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " (*McCoy*, *supra*, 584 U.S. at p. 422.) The high court also made clear that "[p]reserving for the defendant the ability to decide whether to maintain his innocence should not displace counsel's . . . trial management role[]." (*Id*. at p. 423; see *ibid*. [" '[N]umerous choices affecting conduct of the trial' do not require client consent, including 'the

objections to make, the witnesses to call, and the arguments to advance' "].)

In *McCoy*, the defendant shot and killed his estranged wife's mother, stepfather, and son. (*McCoy*, *supra*, 584 U.S. at p. 418.) He was charged with three counts of first degree murder and the prosecutor sought the death penalty. (*Ibid*.) Defense counsel concluded that, given the state of the evidence, "absent a concession at the guilt stage that [the defendant] was the killer, a death sentence would be impossible to avoid at the penalty phase." (*Ibid*.) Accordingly, counsel told the jury in his guilt phase opening statement that "the evidence is 'unambiguous,' [that] 'my client committed three murders.' " (*Id*. at pp. 419–420.) Outside the presence of the jury, the defendant objected to the concession, telling the court that his counsel was " 'selling [him] out.' " (*Id*. at p. 419.) The defendant also testified in his own defense, maintained his innocence, and raised an alibi defense. (*Id*. at p. 420.) After the jury returned three death verdicts, the Louisiana Supreme Court affirmed, concluding defense counsel had the authority to concede the defendant's guilt, notwithstanding the defendant's opposition to his counsel's concession. (*Ibid*.)

In rejecting the state supreme court's conclusion, the United States Supreme Court held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*McCoy*, *supra*, 584 U.S. at p. 417.) The court reasoned, "With individual liberty — and, in capital cases, life — at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence,

leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id*. at pp. 417–418.)

The *McCoy* court further explained that "the violation of [the defendant's] protected autonomy right was complete when the court allowed counsel to usurp control of an issue within [the defendant's] sole prerogative." (*McCoy*, *supra*, 584 U.S. at pp. 426–427.) Describing the error as structural (*id*. at p. 427), the *McCoy* court reasoned that counsel's admission "block[ed] the defendant's right to make the fundamental choices about his own defense," and "a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*Id*. at p. 428.)

In *Bloom*, *supra*, 12 Cal.5th 1008, we applied *McCoy* in concluding that counsel's decision to concede the defendant had killed two victims, despite the defendant's opposition to such concession, "violated [the defendant's] right to determine the objectives of the defense and maintain complete innocence as to these counts." (*Id*. at p. 1036.) However, we concluded that "there was no *McCoy* violation" in connection with a murder charge as to a third victim as to which the defendant "conceded his responsibility." (*Id*. at p. 1040.) We explained that, under *McCoy*, "counsel's presentation of a mental capacity defense on this count, in the absence of a clearly objected-to admission of criminal liability, did not give rise to a Sixth Amendment violation." (*Ibid*.) Thus, since the defendant did not contest his responsibility for killing the third victim, "counsel did not violate the Sixth Amendment by presenting a mental state defense to first degree murder, even though [the defendant] did not wish for counsel to present the defense." (*Id*. at p. 1041.)

### 2. *Application*

Defendant claims the trial court violated his Sixth Amendment right to autonomy by permitting his counsel to present certain categories of evidence to the jury during the penalty phase, over his objection. The evidence related to "attachment theory and [defendant's] dysfunctional childhood," "a comparison [of defendant] to his half-brother," "mental impairment or mental illness," and "purported molestation by [defendant's] uncle when he was a child."[31]

*McCoy* itself suggests that defendant's claim fails. The *McCoy* court twice emphasized that a criminal defendant's Sixth Amendment autonomy right does not encompass tactical evidentiary decisions that the law has long since reserved for a defendant's counsel. First, as previously noted, the *McCoy* court reaffirmed that counsel may decide " 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " (*McCoy*, *supra*, 584 U.S. at p. 422.) Second, the *McCoy* court explained that its recognition of a limited right in a defendant to "decide whether to maintain his innocence" (*id.* at p. 423) would not displace counsel's "trial management role[]" (*ibid.*), and it supported this point by noting that a client need not consent to counsel's determination of "the witnesses to call" (*ibid.*).

---

[31] We assume that defendant objected at trial to the presentation of all the evidence that he maintains the trial court admitted in violation of his Sixth Amendment autonomy right. (See pt. II.D.2., *ante* [discussing defendant's objections to the presentation of certain mitigating evidence in connection with his requests for self-representation].)

Given the *McCoy* court's repeated acknowledgment that defense counsel retains authority to determine the evidence to be proffered in a criminal trial, *McCoy* does not support defendant's argument that counsel lacks the authority to present mitigating evidence over a defendant's objection at the penalty phase of a capital trial. To adopt defendant's claim that he has the authority to veto his counsel's tactical decision to present certain mitigating evidence would allow him to displace counsel's "trial management role[]," and thereby countermand *McCoy*'s delineation of the scope of a defendant's Sixth Amendment autonomy right. (*McCoy, supra,* 584 U.S. at p. 423.)

The *McCoy* court concluded that a criminal defendant's right to insist that his counsel not concede his guilt is among the "fundamental choices about his own defense" reserved to a defendant by the Sixth Amendment. (*McCoy, supra,* 584 U.S. at p. 428.) But those fundamental choices are limited and are not implicated here. Unlike in *McCoy*, counsel here did not expressly contradict his own client's sworn testimony. As we explained in the wake of *McCoy*, " 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*Poore, supra,* 13 Cal.5th at p. 307 ["Defendant had no right to control *how* his lawyer would present a defense if he chose one because '[t]rial management is the lawyer's province,' " citing *McCoy*].)[32]

_____

[32] We made these statements in *Poore* in connection with our consideration of the defendant's claim that the "jury's inability to consider mitigating evidence rendered his sentence

We are not persuaded by defendant's attempt to relabel his disagreements with counsel over the presentation of evidence as pertaining to the *objective* of his penalty phase defense.  Defendant argues that his objective "was to avoid a death sentence by putting on a penalty defense that did not require presenting himself as mentally deficient, slandering a family member, or otherwise presenting intimate and possibly repugnant details about his life, background, and family."  The Fourth Circuit rejected a similar claim in *United States v. Roof* (4th Cir. 2021) 10 F.4th 314 (*Roof*), aptly explaining:  "The presentation of mental health mitigation evidence is, in our view, 'a classic tactical decision left to counsel . . . even when the client disagrees.' [Citations.].  *McCoy* does not subvert the long-established distinction between an objective and tactics . . . . [The defendant]'s interpretation of *McCoy* is flawed because it would leave little remaining in the tactics category by allowing defendants to define their objectives too specifically.  In other words, as the government rightly contends, [the defendant]'s position would allow a defendant to exercise significant control over most important aspects of his trial — such as the presentation of particular evidence, whether to speak to a specific witness, or whether to lodge an objection — as long as he declares a particular strategy or tactic to be of high priority

---

unreliable."  (*Poore*, *supra*, 13 Cal.5th at p. 305.)   However, unlike in this case, because the defendant in *Poore* had not raised a claim under *McCoy*, we did not need to "decide whether . . . decisions about penalty phase evidence are among the 'objective[s] of the defense' over which a represented defendant retains control, for purposes of the Sixth Amendment." (*Id.* at p. 306, fn. 14.)

and labels it an 'objective.' That cannot be." (*Id.* at pp. 352–353.)

The same is true here — defendant's disagreement with counsel over the evidence to present during the penalty phase is not a disagreement "over the objectives of [the] defense . . . but instead over the ways to achieve those objectives." (*United States v. Audette* (9th Cir. 2019) 923 F.3d 1227, 1236.) Further, to adopt defendant's argument that he maintained a Sixth Amendment right to limit the presentation of mitigation evidence to further his "personal or non-tactical objectives" would seem to require, as a practical matter, engaging in the difficult task of determining the reasons for a defendant's objection to the presentation of certain pieces of evidence. Such line drawing would be particularly fraught in the many instances in which a defendant's objections are multifaceted and include a mix of tactical and nontactical rationales. Indeed, in this case, with respect to mitigation evidence pertaining to attachment theory, defendant raised objections that might be characterized as tactical (e.g., stating that the evidence was "likely to be considered by the jury as pure monkey business") as well as those that might be considered personal (e.g., objecting to the introduction of the evidence on the ground that "[u]sing so-called primates and studies to determine why or how humans act" amounted to forcing a theory of "evolution on defendant" that was contrary to "creationism"). We do not read *McCoy* to require a court to untangle such objectives.

The Ninth Circuit's opinion in *United States v. Read* (9th Cir. 2019) 918 F.3d 712 does not persuade us to reach a different result. In *Read*, the Ninth Circuit concluded that a "district court commits reversible error by permitting defense counsel to present a defense of insanity over a competent defendant's clear

rejection of that defense." (*Id.* at p. 719.) The court reasoned that "[a]n insanity defense is tantamount to a concession of guilt"[33] and thus directly implicated *McCoy*'s rule against such concessions over a client's objection. (*Id.* at p. 720.) That reasoning has no application in this case because the presentation of mitigation evidence during the penalty phase bears no resemblance to such a concession. A defense attorney who presents mitigating evidence during the penalty phase of a capital trial is not placing the defendant at risk of "confinement in a mental institution," as may be the case with an attorney who presents an insanity defense. (*Id.* at p. 721.) And, as the *Roof* court recognized in distinguishing *Read*, "[a]cknowledging mental health problems, and bearing any associated stigma, is simply not of the same legal magnitude as a confession of guilt." (*Roof*, *supra*, 10 F.4th at p. 353.)

Defendant contends his claim is supported by our decisions holding that appointed counsel does not render ineffective assistance by acquiescing to a defendant's request not to present *any* mitigating evidence. (See, e.g., *People v. Lang* (1989) 49 Cal.3d 991, 1031.) According to defendant, "It makes little sense that counsel could completely forego a penalty phase defense at the defendant's direction, even where the defendant actively seeks a death sentence, but a capital defendant cannot

---

[33] We observe the characterization is somewhat overbroad. It is true that an insanity defense most often concedes that the defendant committed the actus reus of the offense. However, it is the essence of an insanity defense that the defendant is not guilty because the defendant's mental condition made it impossible for him or her to form the mens rea required for a finding of guilt.

preclude counsel from presenting only specific aspects of the mitigation evidence." We disagree with this contention.

Even assuming that "among the core of fundamental questions over which a represented defendant retains control is the decision whether or not to present a defense at the penalty phase of a capital trial" (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 925), this does not mean that such a defendant, having elected to put on a defense in mitigation, has the right to select the evidence offered to further that defense. As the *McCoy* court explained in connection with a guilt phase defense, "[t]o gain assistance, a defendant need not surrender control entirely to counsel." (*McCoy*, *supra*, 584 U.S. at p. 421.) As discussed, while a represented defendant cedes control over trial management, he retains control over certain fundamental decisions pertaining to the adjudication of his guilt. (*Id.* at pp. 421–422.) Analogously, having elected to put on a defense in mitigation, a defendant cedes to his lawyer the right to control tactical decisions in furtherance of that defense, even assuming the defendant maintains the right to determine the "fundamental question[]" over "whether or not to present a defense at the penalty phase of a capital trial." (*Amezcua and Flores*, at p. 925.)

In sum, we reject defendant's contention that "*McCoy's* reasoning extends to a capital defendant the right to *limit* the presentation of certain mitigating evidence at the penalty phase to achieve his or her personal objectives." We conclude that the trial court did not violate defendant's Sixth Amendment right to choose the objective of his defense.

## G. Defendant's Challenges to California's Death Penalty Scheme Are Without Merit

Defendant raises a series of summary challenges to California's death penalty statute and this court's interpretation of that statute. As defendant acknowledges, this court has "consistently rejected" these arguments. We decline defendant's request to reconsider our prior precedent regarding the following holdings, and we reject all of defendant's challenges.[34]

"Section 190.2 provides a list of the special circumstances . . . [that] render a defendant eligible for the death penalty. These factors are not so numerous and broadly interpreted that they fail to narrow the class of death-eligible first degree murders as required by the Eighth and Fourteenth Amendments." (*People v. Schultz* (2020) 10 Cal.5th 623, 682 (*Schultz*).)

"Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth or Fourteenth Amendments." (*Ramirez, supra*, 13 Cal.5th at p. 1161.)

"Capital sentencing is 'an inherently moral and normative function, and not a factual one amenable to burden of proof calculations.' [Citation.] For this reason, California's death penalty scheme does not violate the Fifth, Sixth, Eighth and Fourteenth Amendments for failing to require written findings [citation]; unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity [citation]; or findings

---

[34] We assume for purposes of this decision that defendant has not forfeited any of his contentions.

beyond a reasonable doubt that aggravating factors exist, that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty [citations]. These conclusions are not altered by *Apprendi v. New Jersey* (2000) 530 U.S. 466 . . . , *Ring v. Arizona* (2002) 536 U.S. 584 . . . , or *Hurst v. Florida* (2016) 577 U.S. 92 . . . ." (*Ramirez*, *supra*, 13 Cal.5th at pp. 1160–1161, fn. omitted.)[35]

Instructing the jury that a death verdict is "warranted" if the aggravating factors are " 'so substantial' " in comparison with the mitigating factors is not impermissibly broad or vague. (*Scully*, *supra*, 11 Cal.5th at p. 611.)

The trial court does not need to instruct the jury that it must impose life without the possibility of parole if it determines that mitigating factors outweigh aggravating factors. (*Scully*, *supra*, 11 Cal.5th at p. 611.)

The trial court did "not impermissibly fail to inform the jurors regarding the . . . lack of need for unanimity as to mitigating circumstances." (*People v. Loy* (2011) 52 Cal.4th 46, 78.)

---

[35] In the omitted footnote, the *Ramirez* court noted, "California does require that section 190.3, factors (b) and (c) evidence be proved beyond a reasonable doubt. This is, however, an evidentiary rule. It is not constitutionally mandated." (*Ramirez*, *supra*, 13 Cal.5th at p. 1161, fn. 51.) Section 190.3, factor (b) pertains to "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," and section 190.3, factor (c) pertains to "[t]he presence or absence of any prior felony conviction."

" ' "[T]here is no requirement jurors be instructed there is a ' " " 'presumption of life . . . .' " ' " ' " (*Tran, supra,* 13 Cal.5th at p. 1236.)

"The penalty phase jury is not required to make written findings regarding its penalty choice, and the absence of such written findings does not preclude meaningful appellate review." (*Schultz, supra,* 10 Cal.5th at p. 684.)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*People v. Johnson* (2016) 62 Cal.4th 600, 656.)

"There was no requirement that inapplicable sentencing factors be deleted." (*People v. Bracamontes* (2022) 12 Cal.5th 977, 1006 (*Bracamontes*).)

The trial court was not required to "define which of the statutory factors could be aggravating and which were only mitigating." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509; accord, *Bracamontes, supra,* 12 Cal.5th at p. 1006.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow* (2003) 30 Cal.4th 43, 126.)

"The death penalty scheme does not violate equal protection principles 'by providing significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with noncapital crimes.' " (*Bracamontes, supra,* 12 Cal.5th at pp. 1006–1007.)

"The imposition of the death penalty under California's law does not violate international law or prevailing norms of decency."  (*People v. Krebs* (2019) 8 Cal.5th 265, 351.)

## III.  DISPOSITION

We affirm the judgment in its entirety.


**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. FRAZIER

S148863


Dissenting Opinion by Justice Liu


I join the portion of Justice Evans's dissenting opinion that addresses the California Racial Justice Act of 2020 (Pen. Code, §§ 745, 1473, 1473.7) and the court's disposition of Frazier's motion for stay and remand thereunder.  (Dis. opn. of Evans, J., *post*, at pp. 1–9.)  For the reasons discussed in Justice Evans's dissenting opinion, I also "disagree with the majority opinion's summary denial of Frazier's motion for a stay of the appeal and a limited remand, which would allow him to pursue a motion for relief" under Penal Code section 745, subdivision (b).  (Dis. opn. of Evans, J., at p. 9.)


**LIU, J.**

1

PEOPLE v. FRAZIER

S148863


Dissenting Opinion by Justice Evans


Robert Ward Frazier was convicted of murder with rape and sodomy special circumstances and sentenced to death. His automatic appeal became fully briefed in 2017. On January 1, 2024, while his automatic appeal was pending, recent amendments to the Racial Justice Act (RJA) (Stats. 2020, ch. 317) took effect, including a provision that permits capital defendants in Frazier's position to request a stay of their appeal and a remand to the superior court to enable them to challenge their death judgment as a product of racial bias. (See Pen. Code, § 745, subd. (b); Stats. 2023, ch. 464, § 1.) Shortly after the 2023 amendments were signed into law, and before they took effect, Frazier filed a Motion for Stay of Appeal and Limited Remand to enable him to present a challenge in the superior court to his death judgment under the RJA. Frazier alleged that there were significant disparities in capital sentencing based on the race of the victim statewide and in Contra Costa County in particular. (See *id.*, subd. (a)(4)(B).) According to his expert's preliminary findings, homicides with White victims in Contra Costa County were twice as likely to result in a death sentence as homicides with Black or Latino victims. The victim in this case was White.

In his motion, Frazier amply justified why he could not currently present his RJA claim in this appeal: it relies on evidence that is outside the appellate record. He has also explained why relegating him to a petition for writ of habeas corpus to present his RJA claims would be "an illusory remedy."

1

As I noted in my dissenting opinion in *People v. Wilson* (Aug. 5, 2024, S118775) ___ Cal.5th ___ [p. 11] (dis. opn. of Evans, J.) (*Wilson*), counsel appointments for capital habeas corpus proceedings are plagued by "yearslong delays" caused, in large part, by a lack of qualified counsel and funding. Indeed, only *one* death row inmate has been appointed counsel to prepare a habeas corpus petition since the passage of Proposition 66 in 2016 — nearly *eight* years ago — and (other than the attorneys at the Habeas Corpus Resource Center) only four attorneys in California have met the qualifications under the Rules of Court to represent capital inmates in habeas corpus proceedings. (*Wilson*, *supra*, ___ Cal.5th ___ [p. 17] (dis. opn. of Evans, J.).) Moreover, once Frazier's appeal becomes final, he will move to the back of a 140-person line as a *Morgan* petitioner (*In re Morgan* (2010) 50 Cal.4th 932) — i.e., a capital defendant whose appeal is final and is awaiting appointment of state habeas counsel. (*Wilson*, *supra*, at p. ___ [pp. 17–18] (dis. opn. of Evans, J.).) Assuming counsel will eventually be appointed despite these constraints and delays, Frazier then points out that "relevant evidence or court records may have been lost," "witnesses may have died," and "[m]emories certainly will have faded."

The habeas corpus procedure is thus less attractive, less desirable, and less efficient — even under ordinary circumstances — than a stay of Frazier's appeal and a remand to permit his current counsel to file a motion for relief under the RJA. But these are not ordinary circumstances, and the RJA is not just any ordinary statute. In enacting the RJA, the Legislature declared that " '[w]e cannot simply accept the stark reality that race pervades our system of justice. Rather, we must acknowledge and seek to remedy that reality and create a

fair system of justice that upholds our democratic ideals."
(Stats. 2020, ch. 317, § 2, subd. (b).)  The RJA squarely rejects
the assumption that racial disparities in our criminal justice
system are "inevitable" and that ensuring "race plays no role at
all in seeking or obtaining convictions or in sentencing" would
result in " 'too much justice.' "  (*Id.*, § 2, subds. (i), (f).)  Instead,
by extending these protections to people who had already been
convicted, the Legislature emphasized that these defendants
had already been waiting "too long" for the remedies provided in
the RJA.  (Assem. Conc. Sen. Amends. to Assem. Bill No. 256
(2021–2022 Reg. Sess.) as amended Aug. 24, 2022, p. 4.)  Indeed,
" '[t]hose with prior, racially biased convictions and sentences
deserve equal justice under the law and *have waited.*' "  (Sen.
Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of
Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Aug. 24,
2022, p. 12, italics added.)

The majority opinion does not dispute that Frazier has
identified a plausible claim for relief under the RJA or that his
claim, if successful, would moot at least part of the instant
appeal.  Nor does it dispute that the Legislature clearly
expressed urgency in remedying racial discrimination in the
criminal justice system, including in death penalty cases, and
amended the RJA just last year to add the stay-and-remand
option precisely because capital defendants are "unlikely to have
habeas attorneys assigned to them due to the unavailability of
qualified counsel, making it nearly impossible to litigate their
RJA claims in a timely fashion."  (Sen. Com. on Pub. Safety,
Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as
amended May 18, 2023, p. 6.)   Yet the majority opinion
nonetheless denies Frazier's request for a stay of his appeal and

a remand to enable him to expeditiously litigate his claim that racism affected his death judgment.

I respectfully disagree. In my view, when the Legislature has spoken in a clear voice that courts must promptly address what is widely understood to be this country's original sin, we should heed its call.

The majority opinion rests its conclusion that Frazier "has failed to establish good cause for staying the current appeal" on three of the factors described in *Wilson, supra*, ___ Cal.5th ___. (Maj. opn., *ante*, at p. 2, fn. 3.) Yet none of these factors, standing alone, together, or when weighed against the purpose of the RJA, justifies a ruling that prevents Frazier from obtaining the "efficient and effective" remedy the Legislature explicitly intended to provide when it added the stay-and-remand procedure. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 6.)

According to the majority opinion, a stay and remand to enable Frazier's current counsel to pursue his RJA claim "would likely 'cause significant delay in the resolution of his appeal.' " (Maj. opn., *ante*, at p. 3, fn. 3.) But the majority fails to explain why a delay in resolving this appeal should weigh more heavily than the Legislature's explicit concern about delays in resolving plausible claims that the judgment below is fatally infected with racial bias. Indeed, rushing to affirm a death judgment in the face of a plausible claim of racial bias — when the Legislature has crafted a mechanism to resolve that claim of bias within the scope of the appeal itself — makes no sense as a matter of judicial economy. If Frazier succeeds on his RJA claim, it would moot most of the issues in this appeal. On the other hand, the

opposite is not true.  Resolving this appeal would not render the RJA proceedings unnecessary.

Moreover, it is difficult to understand how the interests of victims' families, witnesses, and the public are served by the mere formality of affirming a judgment in the circumstances here.  There remains a plausible claim that racial bias infected that judgment, yet the majority opinion delays resolution of that claim by requiring Frazier to institute a separate habeas corpus proceeding (see maj. opn., *ante*, p. 3, fn. 3), presumably to be followed by yet *another* habeas corpus proceeding (see *Wilson*, *supra*, ___ Cal.5th ___ [pp. 106–108]).  This delay is inconsistent with the constitutional right of crime victims to "a prompt and final conclusion of the case *and* any related post-judgment proceedings."  (Cal. Const., art. I, § 28, subd. (b)(9), italics added.)  Consequently, the majority's denial of Frazier's motion does nothing but guarantee new and protracted postjudgment proceedings.  And because the subject of Frazier's claim is racial bias, its delayed resolution will uniquely "undermine[] public confidence in the fairness of the state's system of justice." (Stats. 2020, ch. 317, § 2, subd. (a).)  Accordingly, no one benefits from the majority's decision today.

The majority argues next that Frazier " 'does not need a stay of the appeal or a remand to the superior court to raise [the RJA claim]' in a petition for writ of habeas corpus."  (Maj. opn., *ante*, p. 2, fn. 3.)  While this is true as a matter of technical procedure — i.e., the superior court does have concurrent jurisdiction to consider a petition for writ of habeas corpus that is based on evidence outside the record (see *Wilson*, *supra*, ___ Cal.5th at p. ___ [pp. 101–103]) — it is *not* true as a practical matter, due to the yearslong delays in appointing capital habeas corpus counsel.  (See *ante*, pp. 1–2; *Wilson*, at pp. ___ [pp. 11–

16] (dis. opn. of Evans, J.).) Recognizing this reality, the *Wilson* court leans heavily on the RJA's separate provision for the appointment of counsel (Pen. Code, § 1473, subd. (e)) and speculates that it would "ensure prompt appointment" of counsel to initiate limited-purpose habeas proceedings. (*Wilson*, at p. ___ [p. 110].) This is a misreading of the statutory scheme. The Legislature amended Penal Code section 1473 to provide for the appointment of habeas corpus counsel when it enacted the RJA in *2020*. (Stats. 2020, ch. 317, § 4, subd. (f).) Yet the Legislature evidently did not believe this appointment mechanism provided a viable method for obtaining timely access to the statute's remedies for *capital* defendants. We know this because in 2023, the Legislature crafted the stay-and-remand procedure especially for Frazier and other capital defendants and explained why: "[t]hese individuals are also unlikely to have habeas attorneys assigned to them due to the unavailability of qualified counsel, making it nearly impossible to litigate their RJA claims in a timely fashion." (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 6.) In short, the majority is relying on a fix (in the guise of Pen. Code § 1473, subd. (e)) that the Legislature already recognized was woefully insufficient. Our job here is to interpret the law enacted by the Legislature, not to disagree with or second guess its policy choices.

The majority also deems it significant that Frazier has not asserted that his current counsel " 'would be unavailable to litigate his claim[] if [it were] to be raised instead through a limited-purpose habeas petition addressed exclusively to [that claim].' " (Maj. opn., *ante*, at p. 2, fn. 3.) This is, again, inaccurate. Frazier's motion pointed out, clearly and correctly, that "no court has appointed habeas counsel" for him, "and it

appears unlikely that an appointment will be made in the foreseeable future" because of the "insurmountable backlog of capital cases awaiting appointment of habeas counsel." It therefore matters little that current counsel would not necessarily be "unavailable to litigate his claim" *if* counsel were appointed to represent him in a new habeas corpus proceeding, given that (as Frazier points out) he "will likely have to wait *decades*" for such an appointment. After all — and unmentioned by the majority opinion — this court does not have control over the appointments in any hypothetical future capital habeas corpus proceeding, limited purpose or otherwise. (See Pen. Code, §§ 1473, subd. (e), 1509, subds. (a), (b).) So any assumption that counsel would be made available to him in a timely manner is necessarily speculative.

In rejecting Frazier's motion nonetheless, the majority goes on to speculate that counsel for capital defendants raising RJA claims on habeas corpus might not need to satisfy all of the qualifications currently required for capital habeas counsel and might instead become eligible for appointment under some undefined lower standard. (*Wilson, supra*, ___ Cal.5th at p. ___ [p. 109]; but see *id.* at p. ___ [pp. 14–15] (dis. opn. of Evans, J.).) The majority further speculates that counsel will inexplicably materialize because of the appointment provision in Penal Code section 1473, subdivision (e), despite the fact the Legislature found that mechanism insufficient for capital defendants. (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 6.) Unfortunately, the majority's speculation about the availability of counsel is not supported by any "concrete" evidence. (See *Wilson*, at p. ___ [p. 111, fn. 22].) In particular, the majority opinion cites no instance in which the qualification standards for capital habeas counsel have ever

been relaxed for an RJA claim, nor does it identify a single capital defendant who has been appointed habeas counsel for a limited-purpose RJA proceeding. It relies instead solely on the fact that the appointment provision "*requir[es]* the appointment of counsel to pursue an RJA petition if either the petitioner alleges facts that would establish a violation of the RJA, or at the request of the [Office of the State Public Defender]." (*Wilson*, at p. ___ [pp. 110–111], italics added.) But this argument is as hollow as it is naïve. The existing statutes governing the appointment of counsel for capital habeas petitioners use *identical* mandatory language (see Gov. Code, § 68662; Pen. Code, § 1509, subd. (b)), yet the appointment of counsel for capital habeas petitioners has ground to a halt. The majority provides no explanation why or how appointment of counsel for capital habeas petitioners asserting RJA claims will function any differently.

For all these reasons, one can see that the remedy the majority has provided is an illusory one. While the *Wilson* court declares that the determination whether to grant a motion to stay and remand "will depend on the circumstances of the case at hand" (*Wilson*, *supra*, ___ Cal.5th at p. ___ [p. 117]), the summary analysis offered by the majority here turns not on anything specific to "the case at hand." Instead, it relies upon broad pronouncements about the "late stage of the proceedings," the fact that the RJA claim "is not intertwined with the issues on appeal," and the not uncommon fact that Frazier " 'is represented by the Office of the State Public Defender.' " (Maj. opn., *ante*, at pp. 2–3, fn. 3.) Litigants should likewise note that the *Wilson* court justifies its holding on the dubious assertion that Wilson failed to show that "he faces legal or practical obstacles" to pursuing RJA relief in a habeas corpus petition,

and therefore its holding "does not preclude litigants from raising such concerns in future cases." (*Wilson*, at p. ___ [p. 111 & fn. 22].)  Accordingly, future defendants who specifically identify and articulate these obstacles in their motions to stay and remand under Penal Code section 745, subdivision (b) should be allowed — if the majority means what it says — to obtain efficient and effective resolution of their RJA claims using the stay-and-remand provision as intended by the Legislature.

In the meantime, I respectfully but strenuously disagree with the majority opinion's summary denial of Frazier's motion for a stay of the appeal and a limited remand, which would allow him to pursue a motion for relief under the RJA.  A defendant like Frazier, who has a plausible claim for relief under the RJA — but who would be unable, because of the profound and ongoing dysfunction of the state's capital habeas corpus system, to present that claim for many years unless this appeal were stayed to allow current counsel to file a motion for relief in the superior court *as provided in the RJA itself* (Pen. Code, § 745, subd. (b)) — is not being afforded the "efficient and effective" remedy the Legislature explicitly intended to provide when it added the stay-and-remand procedure.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 6; see also Assem. Conc. Sen. Amends. to Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 1 ["to ensure RJA claims are processed more efficiently and that the intent of the law is followed"].)  To prevent Frazier from using this sensible and efficient mechanism without the assurance of an effective alternative is difficult to understand.  I therefore respectfully dissent.

\*      \*      \*

I also write separately to explain the contours of the majority opinion's conclusion, with which I agree, that Frazier was not denied his Sixth Amendment right to the assistance of counsel when counsel presented, over his objection, certain mitigating evidence during the penalty phase.  (See maj. opn., *ante*, at pp. 60–69.)  In this case, Frazier's disagreement with counsel concerning the evidence to present was "not a disagreement 'over the objectives of [the] defense . . . but instead over the ways to achieve those objectives.' "  (Maj. opn., *ante*, at p. 66, quoting *United States v. Audette* (9th Cir. 2019) 923 F.3d 1227, 1236.)  For example, Frazier complained that proposed mitigation evidence relating to attachment theory was "likely to be considered by the jury as pure monkey business," and counsel conceded at oral argument more generally that his client's objections to the proposed mitigation evidence encompassed "both" tactical and personal reasons and that there was "overlap" between the two.  To accept Frazier's argument that he maintained a Sixth Amendment right to limit the presentation of mitigation evidence under these circumstances would require courts to engage in the difficult task of determining which were the *predominant* reasons for a defendant's objection to certain pieces of evidence.  The majority opinion correctly concludes that the Sixth Amendment does not require a court to untangle such objectives.

This case does not present, and the court today therefore does not consider, what the result would have been if a defendant had objected to certain evidence for *nontactical*, purely personal reasons.  But we did analyze an analogous claim in *People v. Lang* (1989) 49 Cal.3d 991 (*Lang*).  There, we rejected a claim of ineffective assistance of counsel arising from

counsel's acquiescence in the defendant's request that his elderly grandmother not be put through " 'the emotional trauma of having to come here and testify' " about the defendant's character. (*Id*. at p. 1029.) In addition to our own precedent, we relied on scholarly commentary (*id*. at pp. 1030–1031) as well as the ABA Model Code of Professional Responsibility, which advised that " 'the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client . . . .' " (*Id.* at p. 1031.) *Lang* concluded that "[w]hile selection of defense witnesses is generally a matter of *trial tactics* over which the attorney, rather than the client, has ultimate control [citation], it does not necessarily follow that an attorney acts incompetently in honoring a client's request not to present certain evidence for *nontactical* reasons." (*Id*. at p. 1031, italics added; see *People v. Brown* (2014) 59 Cal.4th 86, 112 ["Nothing in *Lang* suggested that such a decision by a defendant based upon *nontactical* factors could be overruled by counsel's assessment of the relative *tactical* merits of a defendant's case. Indeed, as noted, *Lang* suggested that such authority would be detrimental to the attorney-client relationship and might lead defendants to imprudently seek self-representation at the guilt phase"].)

We have not yet decided whether *Lang*'s recognition of a capital defendant's right to control counsel's presentation of mitigating evidence for purely nontactical reasons can be reconciled with the high court's decision in *McCoy v. Louisiana* (2018) 584 U.S. 414 and its allocation of which decisions "are reserved for the client" and which are "the lawyer's province" (*id* at p. 422). (See *People v. Poore* (2022) 13 Cal.5th 266, 312 (conc. opn. of Liu, J.).) As explained above, that issue is not presented in this case, either.

I will nonetheless note that the stakes surrounding this legal question are extraordinarily high. Under this court's "unitary-capital-trial rule," any request for self-representation that is made at the penalty phase is untimely and therefore a matter entrusted to the trial court's discretion. (Maj. opn., *ante*, at pp. 37, 48–49.) The practical problem with this construct is obvious: defendants are unlikely to know, prior to the guilt phase, what the defense case at the penalty phase will look like (see, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1031; *In re Gay* (1998) 19 Cal.4th 771, 825), and they surely are unaware of how counsel will perform at trial. So unless defendants retain some right under *Lang* to exclude certain mitigating evidence at the penalty phase for personal, nontactical reasons, defendants who anticipate having any concerns about what evidence should or should not be presented will be forced "to exercise their Sixth Amendment right of self-representation [citation] before commencement of the guilt phase [citations] in order to retain control over the presentation of evidence at the penalty phase, resulting in a significant loss of legal protection for these defendants during the guilt phase." (*Lang*, *supra*, 49 Cal.3d at p. 1031.) In other words, defendants who wish to avoid inflicting pain on loved ones or maintain a modicum of dignity and privacy in how they are portrayed would have to surrender their right to counsel at the trial that determines whether they have committed crimes that render them eligible for the death penalty *and* at the trial that will determine whether they live or die.

Fortunately, whether capital defendants face this Hobson's choice is not before us in this case, and the majority opinion should not be understood to express a view on that question.

**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Frazier

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S148863
**Date Filed:** August 5, 2024

---

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  John C. Minney

---

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Evan Young and Mark R. Feeser, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Ronald S. Matthias and James W. Bilderback II, Assistant Attorneys General, Glenn R. Pruden, Alice B. Lustre and Victoria Ratnikova, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark R. Feeser
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Victoria Ratnikova
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3848